# KELLY *v.* SOUTH CAROLINA

No. 00–9280.   Argued November 26, 2001—Decided January 9, 2002

SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which KENNEDY, J., joined, *post,* p. 258. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post,* p. 262.

*David I. Bruck,* by appointment of the Court, 534 U. S. 809, argued the cause for petitioner. With him on the briefs was *Robert M. Dudek.*

*S. Creighton Waters,* Assistant Attorney General of South Carolina, argued the cause for respondent. With him on the brief were *Charles M. Condon,* Attorney General, *John W. McIntosh,* Chief Deputy Attorney General, and *Donald J. Zelenka,* Assistant Deputy Attorney General.

JUSTICE SOUTER delivered the opinion of the Court.

Last Term, we reiterated the holding of *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), that when "a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.'" *Shafer* v. *South Carolina*, 532 U. S. 36, 39 (2001) (quoting *Ramdass* v. *Angelone*, 530 U. S. 156, 165 (2000) (plurality opinion)). In this case, the Supreme Court of South Carolina held *Simmons* inapposite for two reasons: state law provided the jury with a third sentencing alternative, and future dangerousness was not at issue. Each reason was error.

I

In 1996, the State of South Carolina indicted petitioner William Kelly for an extraordinarily brutal murder, kidnaping, and armed robbery, and for possession of a knife during the commission of a violent crime. The jury convicted Kelly on all charges.

The trial then proceeded to a separate sentencing phase calling for the jury to determine whether any aggravating factor had been shown and, if so, to choose between recommendations of death or life imprisonment. The prosecutor began by telling the jurors that "I hope you never in your lives again have to experience what you are experiencing right now. Being some thirty feet away from such a person. Murderer." App. 64. He went on to present testimony that while in prison, Kelly had made a knife (or shank) and had taken part in an escape attempt, even to the point of planning to draw a female guard into his cell where he would hold her hostage. See *id.*, at 129–132, 140–141. The prosecutor's cross-examination of a psychologist brought out evi-

dence of Kelly's sadism at an early age, see *id.*, at 218, and his inclination to kill anyone who rubbed him the wrong way, see *id.*, at 195.

After presentation of this evidence but before closing arguments, Kelly's counsel relied on *Simmons* in requesting the judge to instruct the jurors that if Kelly received a sentence of life imprisonment, he would be ineligible for parole. The instruction she sought was a near-verbatim excerpt of S. C. Code Ann. § 16–3–20 (2000 Cum. Supp.):

> " '[L]ife imprisonment' means imprisonment until the death of the offender. No person sentenced to life imprisonment is eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by law." 343 S. C. 350, 360, 540 S. E. 2d 851, 856 (2001).

The prosecutor objected that "I'm not going to argue future dangerous[ness]. So that takes it out of *Simmons* anyhow." App. 245. The defense responded that "the State ha[d] already raised future dangerousness" through presentation of sentencing phase evidence, "calling correctional officers to testify to an escape attempt, to testify to the fact that [Kelly] had possession of a shank, by calling inmates who testified to [Kelly's] behavior in the jail . . . [and] his plan to take a female guard hostage." *Ibid.* Defense counsel argued that the State's cross-examination of the psychologist reinforced the other evidentiary indications of Kelly's future dangerousness. *Id.*, at 245–246. The trial court denied the requested instruction, saying that the State's evidence went to Kelly's character and characteristics, not to future dangerousness. *Id.*, at 249.

The sentencing proceeding then closed with arguments in which the prosecutor spoke of Kelly as "the butcher of Bates-

burg," "Bloody Billy," and "Billy the Kid." *Id.*, at 267–268. The prosecutor told the jurors that "[Kelly] doesn't have any mental illness. He's intelligent. . . . He's quick-witted. Doesn't that make somebody a little more dangerous—" *id.*, at 269. Defense counsel interrupted the prosecutor in mid-sentence with an objection, presumably for raising Kelly's future dangerousness. The prosecutor nonetheless went on immediately, "—for this lady, this crime on January the 5th, doesn't that make him more unpredictable for [the victim] Shirley Shealy." *Ibid.* Kelly's counsel did not renew her objection, and the trial court never ruled on the objection entered.[1] The prosecutor continued that "murderers will be murderers. And he is the cold-blooded one right over there." *Id.*, at 272.

After the closing arguments, the trial judge instructed the jury that in choosing between recommendations of death and life imprisonment, it should consider the possible presence of five statutory aggravating circumstances, and three possible statutory mitigating circumstances. The judge explained "that the terms 'life imprisonment' and 'death sentence' are to be understood in this ordinary and plain meaning." *Id.*, at 289. But, in accordance with the earlier ruling, the court did not say that under South Carolina law, a convicted murderer sentenced to life imprisonment was ineligible for parole, nor did the court instruct that Kelly's future dangerousness was not in issue. At the end of the charge, Kelly's counsel renewed her objection to the court's refusal to give her requested *Simmons* instruction or, in the alternative, to inform the jury that the State had stipulated that future dangerousness was not in issue in the case. App. 304.

---

[1] Although the State Supreme Court referred to this portion of the prosecutor's argument, it did not indicate that defense counsel had objected between the prosecutor's description of Kelly as "dangerous" and his subsequent characterization of Kelly as dangerous to the victim. 343 S. C. 350, 360, 540 S. E. 2d 851, 856 (2001).

After deliberating for 43 minutes, the jury found five statutory aggravating circumstances beyond a reasonable doubt and returned a recommendation of death, *id.*, at 305–307, to which the trial court acceded.

On appeal to the Supreme Court of South Carolina, Kelly assigned error to the trial court's refusal to instruct that he would be ineligible for parole under a life sentence. The State Supreme Court ruled otherwise and gave two alternative grounds for affirming the sentence. First, it followed the trial court in saying that the State's evidence at sentencing did not raise future dangerousness and so did not trigger *Simmons:* "[W]e agree with the trial court that the State's evidence at sentencing did not implicate future dangerousness. . . . In our opinion, the evidence presented by the State in the penalty phase was designed to show that Kelly would not adapt to prison life . . . ." 343 S. C., at 362, 540 S. E. 2d, at 857. Second, relying on its own ruling in *State* v. *Shafer,* 340 S. C. 291, 531 S. E. 2d 524 (2000), rev'd, *Shafer* v. *South Carolina,* 532 U. S. 36 (2001), the state court held that *Simmons* had no application to the sentencing regime in place at Kelly's trial. 343 S. C., at 364, 540 S. E. 2d, at 858. The State Supreme Court committed error on each point. We granted certiorari, 533 U. S. 928 (2001), and now reverse.

## II

We take the State Supreme Court's reasons out of order, for the second one can be answered with little more than citation to *Shafer,* in which we reversed a South Carolina judgment last Term. The state court said that "*Simmons* is inapplicable under [South Carolina's] new sentencing scheme because life without the possibility of parole is not the only legally available sentence alternative to death." 343 S. C., at 364, 540 S. E. 2d, at 858. That statement mistakes the relationship of *Simmons* to the state sentencing scheme. It is true that a defendant charged with murder carrying the

possibility of a death sentence can, under some circumstances, receive a sentence less than life imprisonment. But, as we explained in *Shafer*, under the South Carolina sentencing scheme a jury now makes a sentencing recommendation only if the jurors find the existence of an aggravating circumstance. When they do make a recommendation, their only alternatives are death or life without parole. 532 U. S., at 49–50.[2] We therefore hold, as we did in *Shafer*, that the state court's reasoning is not to the point.

The State Supreme Court's first ground, that Kelly's future dangerousness was not "at issue," is unsupportable on the record before us. It is not that the state court failed to pose the legal issue accurately, for in considering the applicability of *Simmons* it asked whether Kelly's future dangerousness was "a logical inference from the evidence," or was "injected into the case through the State's closing argument." 343 S. C., at 363, 540 S. E. 2d, at 857; see also *Shafer, supra*, at 54–55 (whether prosecutor's evidence or argument placed future dangerousness in issue); *Simmons*, 512 U. S., at 165, 171 (plurality opinion) (future dangerousness in issue because "State raised the specter of . . . future dangerousness generally" and "advanc[ed] generalized arguments regarding the [same]"); *id.*, at 174 (GINSBURG, J., concurring); *id.*, at 177 (O'CONNOR, J., concurring in judgment). The error, rather,

---

[2] Under South Carolina law, capital jurors first must decide whether the State has proven the existence of any statutory aggravating circumstance beyond a reasonable doubt. If the jury cannot agree unanimously on the presence of such a circumstance, it cannot make a sentencing recommendation; the judge is then charged with sentencing the defendant either to life imprisonment without parole or to a prison term of at least 30 years. S. C. Code Ann. §§ 16–3–20(B), (C) (2000 Cum. Supp.); *State* v. *Starnes*, 340 S. C. 312, 328, 531 S. E. 2d 907, 916 (2000). But, if the jury does unanimously find a statutory aggravating circumstance, it recommends one of two possible sentences: death or life imprisonment without the possibility of parole. §§ 16–3–20(A), (B). The jury has no other sentencing option.

was on the facts: the evidence and argument cited by the state court are flatly at odds with the view that "future dangerousness was not an issue in this case." 343 S. C., at 363, 540 S. E. 2d, at 857.

The court acknowledged the prosecutor's "[e]vidence that Kelly took part in escape attempts and carried a shank," *id.*, at 362, 540 S. E. 2d, at 857, and that "he had been caught carrying a weapon and planning or participating in escape attempts," *ibid.* The court concluded, however, that this evidence was not the sort contemplated by *Simmons*, that is, evidence demonstrating future danger "'*if released* from prison.'" 343 S. C., at 362, n. 8, 540 S. E. 2d, at 857, n. 8 (quoting *Simmons, supra,* at 163) (emphasis added by state court). The court saw the evidence as going only to Kelly's likely behavior in prison, or to his proclivity to escape from it; the state court said that Kelly was allowed to rebut this evidence of his inability to adapt to prison life, but that explaining parole ineligibility would do nothing to rebut evidence that Kelly was an escape risk. 343 S. C., at 362–363, 540 S. E. 2d, at 857.

Even if we confine the evidentiary consideration to the evidence discussed by the State Supreme Court, the court's conclusion cannot be accepted. To the extent that it thought that "[e]vidence that Kelly took part in escape attempts and carried a shank . . . is not the type of future dangerousness evidence contemplated by *Simmons*," *id.*, at 362, 540 S. E. 2d, at 857, it overlooked that evidence of violent behavior in prison can raise a strong implication of "generalized . . . future dangerousness." *Simmons, supra,* at 171. (And, of course, the state court's reasoning says nothing about the evidence of the crime, or of Kelly's sadism generally, and his mercurial thirst for vengeance.) A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior,

whether locked up or free, and whether free as a fugitive or as a parolee.[3]

The fallacy of the State Supreme Court's attempt to portray the thrust of the evidence as so unrealistically limited harks back to a comparable mistake by the trial judge, who spoke of the evidence as going, not to future dangerousness, but "to [Kelly's] character and characteristics." App. 249. The error in trying to distinguish *Simmons* this way lies in failing to recognize that evidence of dangerous "character" may show "characteristic" future dangerousness, as it did here. This, indeed, is the fault of the State's more general argument before us, that evidence of future dangerousness counts under *Simmons* only when the State "introduc[es] evidence for which there is *no other possible inference* but future dangerousness to society." Brief for Respondent 27 (emphasis in original). Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.[4]

---

[3] THE CHIEF JUSTICE's dissent correctly notes that a required instruction on parole eligibility does not bar a prosecutor from arguing dangerousness in prison as a ground for choosing the death penalty. See *post*, at 261. The plurality acknowledged this possibility in *Simmons* v. *South Carolina*, 512 U. S. 154, 165, n. 5 (1994) ("[T]he fact that a defendant is parole ineligible does not prevent the State from arguing that the defendant poses a future danger"); see also *id.*, at 177 (O'CONNOR, J., concurring in judgment) (when the defendant "bring[s] his parole ineligibility to the jury's attention" "the prosecution is free to argue that the defendant would be dangerous in prison"). But the plurality also recognized that even if a "State [were] free to argue that the defendant will pose a danger to others in prison," *id.*, at 165, n. 5, the State was not free to "mislead the jury by concealing accurate information about the defendant's parole ineligibility," *ibid.*

[4] As THE CHIEF JUSTICE says, see *post*, at 261 (dissenting opinion), it may well be that the evidence in a substantial proportion, if not all, capital cases will show a defendant likely to be dangerous in the future. See *Simmons, supra*, at 163 (plurality opinion) (noting that "prosecutors in South Carolina, like those in other States that impose the death penalty,

The prosecutor accentuated the clear implication of future dangerousness raised by the evidence and placed the case within the four corners of *Simmons.* He had already expressed his hope that the jurors would "never in [their] lives again have to experience . . . [b]eing some thirty feet away from such a person" as Kelly. App. 64. The State Supreme Court made no mention of this, despite its thrust: since the jurors were unlikely to be spending any time in prison, they would end up 30 feet away from the likes of Kelly only if he got out of prison, as he might if parole were possible. The argument thus echoed the one made in *Simmons* itself, that the imposition of the death penalty was an act of "self-defense." Both statements "implied that petitioner *would* be let out eventually if the jury did not recommend a death sentence." 512 U. S., at 178 (O'CONNOR, J., concurring in judgment) (emphasis in original).

And there was more. The state court to be sure considered the prosecutor's comparison of Kelly to a notorious serial killer, variously calling him a "dangerous" "bloody" "butcher." The court nonetheless thought it could somehow cordon off these statements as raising nothing more than a call for retribution. 343 S. C., at 363, 540 S. E. 2d, at 857. But the import of the argument simply cannot be compartmentalized this way. Characterizations of butchery did go to retribution, but that did not make them any the less arguments that Kelly would be dangerous down the road.[5] They

---

frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase"). But this is not an issue here, nor is there an issue about a defendant's entitlement to instruction on a parole ineligibility law when the State's evidence shows future dangerousness but the prosecutor does not argue it. The only questions in this case are whether the evidence presented and the argument made at Kelly's trial placed future dangerousness at issue. The answer to each question is yes, and we need go no further than *Simmons* in our discussion.

[5] Nor, as the State Supreme Court thought, was evidence, elicited by the prosecution, that Kelly "took part in escape attempts," 343 S. C., at 362, 540 S. E. 2d, at 857, somehow distinct from indications of dangerousness. It is true that evidence of propensity to escape does not necessarily

complemented the prosecutor's submissions that Kelly was "more frightening than a serial killer," App. 260, and that "murderers will be murderers," *id.*, at 272.[6] Thus was Kelly's jury, like its predecessor in *Simmons*, invited to infer "that petitioner is a vicious predator who would pose a continuing threat to the community." *Simmons, supra,* at 176 (O'CONNOR, J., concurring in judgment).

Perhaps because this is so undeniable, the State in its argument before us takes a tack never pursued by the state court, in claiming there was no need for instruction on parole ineligibility, because "there is nothing whatsoever to indicate that the jurors were concerned at all with the possibility of [Kelly's] future release when they decided death was appropriate." Brief for Respondent 47. But it cannot matter that Kelly's jury did not ask the judge for further instruction on parole eligibility, whereas the *Simmons* and *Shafer* juries did. See *Shafer,* 532 U. S., at 44; *Simmons, supra,* at 160. A trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part. Cf. C. Wright, Federal Practice and Procedure § 485, p. 375 (3d ed. 2000) ("It is the duty of the trial judge to charge the jury on all essential questions of law, whether requested or not"). Time after time appellate courts have found jury instructions to be insufficiently clear without any record that the jury manifested its confusion; one need look no further than *Penry* v. *Johnson,* 532 U. S. 782 (2001), for a recent example. While the jurors' questions in *Simmons* and *Shafer* confirmed the inadequacy of the charges in those cases, in each case it was independently

---

put future dangerousness at issue, but here, the prosecution proffered evidence of at least one violent escape attempt. The evidence of Kelly's plan to take a female guard hostage with a shank underscored a propensity for violence in addition to a predilection to escape.

[6] The latter statement, in fact, speaks not to Kelly's past conduct, but to his future deportment.

significant that "[d]isplacement of 'the longstanding practice of parole availability' remains a relatively recent development [in South Carolina], and 'common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole.'" 532 U. S., at 52 (quoting *Simmons, supra,* at 177–178 (O'CONNOR, J., concurring in judgment)).[7]

Nor is there any reason to believe that Kelly's jury was better informed than Simmons's or Shafer's on the matter of parole eligibility. The State, to be sure, emphasizes defense counsel's opening statement that the jury's recommendation would be "the sentence actually imposed and the sentence that will actually be carried out," Record 1660, as well as counsel's closing, which stressed that Kelly would be in prison for the rest of his life and would "never see the light of daylight again," *id.,* at 2060. The State stresses that the judge told the jury that the terms "life imprisonment" and "death sentence" should be understood in their plain and ordinary meanings. App. 289.

But the same things could be said of *Shafer,* where we explicitly noted defense counsel's statement to the jury that Shafer would "'die in prison' after 'spend[ing] his natural life there,'" as well as the trial judge's instructions that "'life imprisonment means until the death of the defendant.'" 532 U. S., at 52 (emphasis deleted). We found these statements inadequate to convey a clear understanding of Shafer's parole ineligibility, *id.,* at 53–54,[8] and Kelly, no less than Shafer, was entitled to his requested jury instruction.

---

[7] Whether this history of penology should suffice to require a *Simmons* instruction regardless of the details of evidence and argument going to future dangerousness is a question not raised by this case, in which evidence and argument did place dangerousness in issue.

[8] If Kelly's counsel had read the law verbatim to the jury with the judge's manifest approval, that might have sufficed, but the State does not claim that defense counsel had any such opportunity, and conceded at oral argument that it is "very unlikely" that the trial judge would have permit-

The judgment of the Supreme Court of South Carolina is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE KENNEDY joins, dissenting.

In *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), the prevailing opinion said:

> "In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact. Likewise, if the prosecution does not argue future dangerousness, the State may appropriately decide that parole is not a proper issue for the jury's consideration even if the only alternative sentence to death is life imprisonment without possibility of parole.
>
> "When the State seeks to show the defendant's future dangerousness, however, the fact that he will never be released from prison will often be the only way that a violent criminal can successfully rebut the State's case. . . . And despite our general deference to state decisions regarding what the jury should be told about sentencing, I agree that due process requires that the defendant be allowed to do so in cases in which the only available alternative sentence to death is life imprisonment without possibility of parole and the prosecution argues that the defendant will pose a threat to society in the future." *Id.,* at 176–177 (O'CONNOR, J., concurring in judgment).

But today, while purporting to merely "apply" *Simmons,* the Court converts a tenable due process holding into a "truth in sentencing" doctrine which may be desirable policy, but

---

ted defense counsel to read to the jury the relevant section of the South Carolina Code. See Tr. of Oral Arg. 51.

has almost no connection with the due process rationale of *Simmons.*

In some States—Texas, for example, see Tex. Crim. Proc. Code Ann. §§ 37.071(b) and (g) (2001)—"future dangerousness" is itself a ground for imposing the death penalty in a capital case. In *California* v. *Ramos,* 463 U. S. 992 (1983), we held that such a system was consistent with the Eighth Amendment. But South Carolina's capital punishment system does not work that way. There are 11 statutory aggravating factors which may be found by the jury that must be weighed against mitigating factors.* See S. C. Code Ann.

---

*The statutory aggravating factors are:

"(1) The murder was committed while in the commission of the following crimes or acts:

"(a) criminal sexual conduct in any degree;

"(b) kidnapping;

"(c) burglary in any degree;

"(d) robbery while armed with a deadly weapon;

"(e) larceny with use of a deadly weapon;

"(f) killing by poison;

"(g) drug trafficking as defined in Section 44–53–370(e), 44–53–375(B), 44–53–440, or 44–53–445;

"(h) physical torture; or

"(i) dismemberment of a person.

"(2) The murder was committed by a person with a prior conviction for murder.

"(3) The offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which normally would be hazardous to the lives of more than one person.

"(4) The offender committed the murder for himself or another for the purpose of receiving money or a thing of monetary value.

"(5) The murder of a judicial officer, former judicial officer, solicitor, former solicitor, or other officer of the court during or because of the exercise of his official duty.

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

"(7) The murder of a federal, state, or local law enforcement officer, peace officer or former peace officer, corrections employee or former cor-

§ 16–3–20(C) (2001). At the sentencing phase of petitioner's trial, the State argued, and the jury found, the statutory aggravators that the murder was committed while in the commission of: kidnaping; burglary; robbery while armed with a deadly weapon; larceny with use of a deadly weapon; and physical torture. Once a South Carolina jury has found the necessary aggravators, it may consider future dangerousness in determining what sentence to impose.

In the present case, the prosecutor did not argue future dangerousness—as he did in *Simmons*—in any meaningful sense of that term. But the Court says that he need not, in order for the defendant to invoke *Simmons;* it is enough if evidence introduced to prove other elements of the case has a tendency to prove future dangerousness as well. Gone is the due process basis for the rule—that where the State argues that the defendant will be dangerous in the future, the defendant is entitled to inform the jury by way of rebuttal that he will be in prison for life. Thus, the *Simmons* rule is invoked, not in reference to any contention made by the State, but only by the existence of evidence from which a jury might infer future dangerousness. And evidence there will surely be in a case such as the present one, correctly described by the Court as "an extraordinarily brutal murder." *Ante*, at 248.

---

rections employee, or fireman or former fireman during or because of the performance of his official duties.

"(8) The murder of a family member of an official listed in subitems (5) and (7) above with the intent to impede or retaliate against the official. 'Family member' means a spouse, parent, brother, sister, child, or person to whom the official stands in the place of a parent or a person living in the official's household and related to him by blood or marriage.

"(9) Two or more persons were murdered by the defendant by one act or pursuant to one scheme or course of conduct.

"(10) The murder of a child eleven years of age or under.

"(11) The murder of a witness or potential witness committed at any time during the criminal process for the purpose of impeding or deterring prosecution of any crime." S. C. Code Ann. § 16–3–20(C) (2001).

That today's decision departs from *Simmons* is evident from the Court's rejection of the South Carolina Supreme Court's distinction between evidence regarding danger to fellow inmates and evidence regarding danger to society at large. *Simmons* itself recognized this distinction. Immediately after holding that the defendant should be allowed to show that "he never would be released on parole and thus, in his view, would not pose a future danger *to society*," 512 U. S., at 165 (emphasis added), *Simmons* noted that "[t]he State is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff," *id.*, at 165, n. 5. See also *id.*, at 177 (O'CON-NOR, J., concurring in judgment) (noting that where a parole ineligibility instruction is given, "the prosecution is free to argue that the defendant would be dangerous in prison"). This makes eminent good sense, for when the State argues that the defendant poses a threat to his cellmates or prison guards, it is no answer to say that he never will be released from prison.

But the test is no longer whether the State argues future dangerousness to society; the test is now whether evidence was introduced at trial that raises an "implication" of future dangerousness to society. *Ante,* at 253. It is difficult to envision a capital sentencing hearing where the State presents no evidence from which a juror might make such an inference. I would hazard a guess that many jurors found the sheer brutality of this crime—petitioner bound the hands of the victim (who was six months pregnant) behind her back, stabbed her over 30 times, slit her throat from ear to ear, and left dollar bills fastened to her bloodied body—indicative of petitioner's future threat to society. Yet all of this evidence was introduced not to prove future dangerousness, but to prove other elements required by South Carolina law, including the statutory aggravating factor that the murder was committed while in the commission of physical torture.

To be sure, the prosecutor's arguments about the details of the murder, as well as the violent episodes in prison, demonstrated petitioner's evil character. Yet if this were what *Simmons* intended with the phrase "future dangerousness," it would have held that the Constitution *always* required an instruction about parole ineligibility. It plainly did not.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

THE CHIEF JUSTICE, in dissent, concludes that, with the Court's opinion, "[g]one is the due process basis for the *[Simmons]* rule—that where the State argues that the defendant will be dangerous in the future, the defendant is entitled to inform the jury by way of rebuttal that he will be in prison for life." *Ante,* at 260. I write separately because I continue to believe that there never was a "basis for such a pronouncement." *Simmons* v. *South Carolina,* 512 U.S. 154, 178 (1994) (SCALIA, J., dissenting). Indeed, the decision today merely solidifies my belief that the Court was wrong, in the first instance, to hold that the Due Process Clause requires the States to permit a capital defendant to inform the jury that he is parole ineligible in cases where the prosecutor argues future dangerousness.

While we were informed in *Simmons* that the Court's intent was to create a requirement that would apply in only a limited number of cases, today's sweeping rule was an entirely foreseeable consequence of *Simmons.* See *id.,* at 183. The decisive opinion[1] noted that "if the prosecution does not argue future dangerousness, the State may appropriately decide that parole is not a proper issue for the jury's consider-

---

[1] Justice Blackmun's plurality opinion in *Simmons* was joined by three Members of the Court. JUSTICE O'CONNOR, joined by THE CHIEF JUSTICE and JUSTICE KENNEDY, provided the necessary votes to sustain the judgment. Concurring in the judgment, JUSTICE O'CONNOR therefore wrote the decisive opinion. See *O'Dell* v. *Netherland,* 521 U.S. 151, 158–159 (1997).

ation even if the only alternative sentence to death is life imprisonment without possibility of parole." *Id.*, at 176–177 (O'CONNOR, J., concurring in judgment). One might think from this language that the Court meant to preserve in most cases the State's role in determining whether to instruct a jury regarding a defendant's eligibility for parole. But the decisive opinion seriously diminished the State's discretion in this area, holding that due process requires that "[w]hen the State *seeks to show* the defendant's future dangerousness . . . the defendant should be allowed to bring his parole ineligibility to the jury's attention." *Id.*, at 177 (emphasis added).[2] Applying this rule, the Court concluded that the prosecution "put [Simmons'] future dangerousness in issue" and that due process required that the instruction be given. *Id.*, at 177–178.

After *Simmons*, we were left with a due process requirement that hinged on a factual inquiry as to whether the State somehow "show[ed] the defendant's future dangerousness," "argue[d] future dangerousness, " or "put . . . future dangerousness in issue." *Id.*, at 176–177. Given such an imprecise standard, it is not at all surprising that the Court today easily fits the State's argument during Kelly's proceedings into the universe of arguments that trigger the *Simmons* requirement. But the Court goes even further. In making this factual judgment, the Court dilutes the *Simmons* test, now requiring that a parole ineligibility instruction be given where the prosecution makes arguments that have a *"tendency* to prove dangerousness in the future." *Ante*, at 254 (emphasis added).

This expansion is not surprising when one considers that in *Simmons* the Court applied its own rule loosely. Placed

---

[2] The plurality opinion used broader language, stating that due process requires the instruction when the "prosecution allude[s]" to the defendant's future dangerousness or "advanc[es] generalized arguments regarding the defendant's future dangerousness." *Simmons* v. *South Carolina*, 512 U. S., at 164, 171.

in context, the prosecutor *there* neither "emphasiz[ed] future dangerousness as a crucial factor" nor even mentioned "future dangerousness *outside of prison*." 512 U. S., at 181 (SCALIA, J., dissenting).[3] Thus, while I agree with THE CHIEF JUSTICE that the prosecutor *here* did not argue future dangerousness, an effort to distinguish this case from *Simmons* amounts to hairsplitting, demonstrating that the Court's inability to construct a limited rule inhered in *Simmons* itself. Today, the Court acknowledges that "the evidence in a substantial proportion, if not all, capital cases will show a defendant likely to be dangerous in the future." *Ante*, at 254, n. 4. "All" is the more accurate alternative, given that our capital jurisprudence has held that routine murder does not qualify, but only a more narrowly circumscribed class of crimes such as those that "reflec[t] a consciousness materially more 'depraved' than that of any person guilty of murder," *Godfrey* v. *Georgia*, 446 U. S. 420, 433 (1980) (plurality opinion). See also *Lowenfield* v. *Phelps*, 484 U. S. 231, 246 (1988) ("Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person'"). It is hard

---

[3] Turning to the statements upon which the *Simmons* plurality and concurring opinions relied, JUSTICE SCALIA noted that the prosecutor's comment concerning "'what to do with [petitioner] now that he is in our midst' . . . was not made (as they imply) in the course of an argument about future dangerousness, but was a response to petitioner's mitigating evidence." *Id.*, at 181–182. Similarly, "the prosecutor's comment that the jury's verdict would be an 'act of self-defense' . . . came at the end of admonition of the jury to avoid emotional responses and enter a rational verdict." *Id.*, at 182. As JUSTICE SCALIA indicates, the reference "obviously alluded, neither to defense of the jurors' own persons, nor specifically to defense of persons outside the prison walls, but to defense of all members of society against this individual, wherever he or they might be. . . . [T]he prosecutor did not *invite* the jury to believe that petitioner would be eligible for parole—he did not *mislead* the jury." *Ibid.*

to imagine how, for example, the depravity of mind that such a crime displays will not always have a "tendency" to show future dangerousness. And it is of little comfort that today's opinion technically requires not merely evidence with this tendency, but argument by the prosecutor, *ante*, at 254–255, n. 4. When does a prosecutor *not* argue the evidence, and when will argument regarding depravity not also constitute argument showing dangerousness? Thus, today the Court eviscerates the recognition in the *Simmons'* decisive opinion that "[t]he decision whether or not to inform the jury of the possibility of early release is generally left to the States." 512 U. S., at 176 (O'CONNOR, J., concurring in judgment).

Today's decision allows the Court to meddle further in a State's sentencing proceedings under the guise that the Constitution requires us to do so. I continue to believe, without qualification, that "it is not this Court's role to micromanage state sentencing proceedings." *Shafer* v. *South Carolina,* 532 U. S. 36, 58 (2001) (THOMAS, J., dissenting). As a matter of policy, it may be preferable for a trial court to give such an instruction, but these are "matters that the Constitution leaves to the States." *Ibid.*

For these reasons, I respectfully dissent.