Luke A. WILLIAMS, III,
Petitioner–Appellee,

v.

Jon OZMINT, Commissioner, South Carolina Department of Corrections, Respondent–Appellant.

Luke A. Williams, III, Petitioner–Appellant,

v.

Jon Ozmint, Commissioner, South Carolina Department of Corrections, Respondent–Appellee.

Nos. 06–16, 06–17.

United States Court of Appeals, Fourth Circuit.

Argued: May 22, 2007.

Decided: July 27, 2007.

480

**ARGUED:** Donald John Zelenka, Assistant Deputy Attorney General, Office of the Attorney General of South Carolina, Columbia, South Carolina, for Jon Ozmint, Commissioner, South Carolina Department of Corrections. David Isaac Bruck, Washington & Lee University, School of Law, Lexington, Virginia, for Luke A. Williams, III. **ON BRIEF:** Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Derrick K. McFarland, Assistant Attorney General, Office of the Attorney General of South Carolina, Columbia, South Carolina, for Jon Ozmint, Commissioner, South Carolina Department of Corrections. Keir M. Weyble, Columbia, South Carolina, for Luke A. Williams, III.

Before NIEMEYER and MICHAEL, Circuit Judges, and WILKINS, Senior Circuit Juge.

Reversed in part and affirmed in part by published opinion. Judge MICHAEL wrote the opinion, in which Judge NIEMEYER and Senior Judge WILKINS joined.

## OPINION

MICHAEL, Circuit Judge:

Luke A. Williams, III, was convicted and sentenced to death in South Carolina state court for the 1991 murders of his wife and son. The Supreme Court of South Carolina affirmed his conviction and sentence and later denied his application for post-conviction relief. Thereafter, Williams petitioned for habeas review in federal court. The district court issued the writ, concluding that Williams received ineffective assistance when his counsel failed to request a jury instruction that the term "life imprisonment" should be understood in its "ordinary and plain meaning." *See State v. Davis*, 306 S.C. 246, 411 S.E.2d 220, 222 (1991). The state appeals, and we must reverse. We conclude that the Supreme Court of South Carolina did not unreasonably apply *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when it determined that Williams's defense was not prejudiced by the lack of a plain meaning instruction. We also reject Williams's cross-appeal, concluding that the state supreme court did not unreasonably apply the standards enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), when it determined that the evidence was sufficient to establish that Williams committed the murders and that venue was proper in Edgefield County, South Carolina.

## I.

The facts, as recounted by the Supreme Court of South Carolina in its opinion in Williams's direct appeal, are as follows:

At approximately 11:00 a.m. on Wednesday, June 19, 1991, the bodies of Linda Williams (Wife) and Shawn Williams (Son) were discovered inside the family van in a forest in Edgefield County, South Carolina, approximately six miles from their home near Augusta, Georgia. The front bumper of the van was against a tree, and fire had partially damaged the vehicle. The investigators detected a strong odor of gasoline and found several metal cans containing gasoline inside the van. Wife was discovered in the driver's seat, which was positioned so far back that her feet could not reach the pedals, and Son was seated in the front passenger seat. Blood was found on a piece of PVC pipe on the van's floorboard. Wife was dressed in a gray t-shirt, gray sweatpants pulled down to her upper thigh, light pink socks, nylon panties, and she was not wearing a bra or shoes. Son was also shoeless and was wearing a t-shirt and sweatpants.

Wife suffered a black eye, a contusion on the bridge of her nose, contusions on her left forearm, and abrasions on her left shoulder. These injuries were consistent with having been caused by a human fist. The autopsy revealed that Wife's cause of death was blunt head trauma due to a beating. Son suffered a bruise to his forehead, as well as abrasions to his chin, back, and right side of his neck. His cause of death was asphyxiation due to manual strangulation. Wounds created by the fire were postmortem. Although the deaths occurred within the same time frame, a specific time of death was not determined.

At trial, several friends of Wife testified that she always dressed neatly and would not go out in public dressed in a t-shirt without a bra. Additionally, they stated that because Wife was short in stature, she always positioned the driver's seat of the van close to the steering wheel. One friend stated that she last spoke with Wife by telephone at 2:50 p.m. on June 18, 1991. A neighbor testified that on June 19, 1991, a car drove into the driveway at Williams' home between 1:00 and 2:00 a.m. Further testimony established that at approximately 7:00 a.m. on June 19, 1991, Wife's van was not parked in the driveway.

A bath towel and Son's tennis shoes with blood stains on them were found at Williams' home. In addition, Williams' right hand was severely bruised and swollen—this injury was consistent with having occurred on June 19th. Williams told a friend that on the day of the homicides, Wife and Son were planning to go shopping at Columbia Mall in Columbia, South Carolina. Prior to receiving the autopsy results, Williams informed the friend that Wife had been beaten to death, and Son had been strangled with a plastic wire wrap similar to wire wrap Son had in his bedroom. When asked if he killed Wife and Son, Williams did not respond.

Williams and Wife were experiencing significant marital and financial difficulties. Neighbors and friends stated that they frequently overheard Williams and Wife engaging in hostile arguments. One neighbor testified that she heard a "loud thump" during one of the arguments. In addition, Williams and Wife had declared bankruptcy, and foreclosure proceedings had been initiated against their home.

Williams had substantially increased life insurance benefits on Wife and Son during May of 1991, designating himself as beneficiary. On May 7, 1991, Williams upgraded existing policies with Allstate Insurance Company to include auto related death benefits in the amounts of $100,000 for Wife and $20,000 for Son. Williams forged Wife's name on the enrollment form. After their deaths, Williams made claims under two Allstate policies in the amounts of $200,000 on Wife and $45,000 on Son. Williams also took out new life insurance policies for Wife and Son with State Farm Insurance Company effective May 30, 1991, providing Wife with death benefit insurance in the amount of $250,000 and Son with $25,000 in death benefit insurance. [Williams applied for $500,000 in death benefit insurance for Wife; however, until the policy was approved a binder limited the amount of coverage to $250,000.] Williams indicated on the claims forms that Wife and Son had died in Edgefield County, South Carolina.

*State v. Williams*, 321 S.C. 327, 468 S.E.2d 626, 628–29 (1996).

At the conclusion of the state's case, Williams moved for a directed verdict, arguing that the evidence was insufficient to convict him of the murders, that Edgefield County, South Carolina, was not the proper venue, and that the Edgefield County circuit court lacked subject matter and personal jurisdiction. The circuit court denied the motion, and Williams thereafter declined to testify or present other evidence. The jury returned a guilty verdict on both charges of murder. In the penalty phase the jury recommended death sentences, finding two (statutory) aggravating circumstances: (1) that Williams committed the murders for monetary gain and (2) that he murdered two or more persons by one act or pursuant to one scheme or course of conduct. The circuit court followed the jury's recommendation and im-

posed a separate death sentence for each murder. In his direct appeal to the Supreme Court of South Carolina, Williams claimed, among other things, that the evidence was insufficient to establish venue and guilt. The state supreme court, in a thorough opinion, affirmed Williams's convictions and sentences, *id.*, and the U.S. Supreme Court denied his petition for a writ of certiorari, *Williams v. South Carolina*, 519 U.S. 891, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996).

Williams filed two applications for state post-conviction relief, the second of which was granted by the circuit court (PCR court). The PCR court concluded that Williams was denied effective assistance of counsel because his trial counsel failed to request a jury instruction that the term "life imprisonment" should be understood in its ordinary and plain meaning. According to the PCR court, the instruction was necessary to ensure that the jury understood the nature of its life imprisonment option. The PCR court therefore granted Williams a new sentencing proceeding. The state then petitioned the Supreme Court of South Carolina for a writ of certiorari, and that court reversed the decision of the PCR court. Although the state supreme court concluded that Williams's counsel was ineffective for failing to request a plain meaning instruction, it ultimately determined that Williams was not prejudiced by the deficient performance. Specifically, the court found "no evidence in the record to support the ... conclusion ... that had the jury been given a 'plain meaning' charge there is a reasonable possibility it would have [reached a different result and] returned two life sentences." J.A. 188.

Next, Williams filed a petition for a writ of habeas corpus in U.S. District Court, and that court granted relief. First, the district court agreed with the Supreme Court of South Carolina that Williams's counsel was ineffective for failing to request a plain meaning instruction. Second, the court determined that counsel's ineffectiveness "was reasonably likely to have affected the outcome of [Williams's] capital sentencing hearing" because, among other things, Williams's "prior history contained a number of mitigating factors," including no criminal record. J.A. 385. The district court rejected Williams's claim that the evidence was insufficient to support his convictions or South Carolina venue. The state appeals the award of the writ on Williams's ineffective assistance claim, and Williams cross-appeals, arguing that the writ should have been awarded on the additional ground that the evidence was not sufficient to establish his guilt or proper venue.

## II.

■ When, as in this case, a district court's decision on a petition for a writ of habeas corpus is based on a state court record, our review is *de novo*. *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir.2005). Federal habeas review in this case focuses only on legal determinations made by the Supreme Court of South Carolina in adjudicating the merits of claims raised by Williams. Accordingly, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), provides that a federal writ may not be issued unless the underlying state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court instructs us that "[u]nder § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be [objectively] unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### III.

### A.

■ Williams contends that he was denied his Sixth Amendment right to assistance of counsel when his lawyer failed to request the South Carolina "plain meaning" instruction in his capital sentencing proceeding. In rejecting Williams's claim, the Supreme Court of South Carolina applied *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the U.S. Supreme Court case that sets the standards for judging whether a criminal defendant's conviction or death sentence must be set aside because counsel rendered ineffective assistance. A conviction or death sentence must be set aside when counsel's performance was deficient and the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052. The deficiency inquiry centers on whether counsel's performance "fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. To avoid "the distorting effects of hindsight," however, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. The defendant (or petitioner) bears the burden of overcoming this presumption. *Id.* When counsel's assistance in a capital sentencing proceeding was deficient, the prejudice inquiry centers on "whether there is a reasonable probability that, absent [counsel's] errors, the sentencer ... would have concluded that the balance of aggra-

vating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052. The "totality of the evidence before the judge or jury" must be considered in making this determination. *Id.* Our review convinces us that the Supreme Court of South Carolina did not engage in an unreasonable application of *Strickland* when it determined that although Williams's counsel performed in a deficient manner when he failed to request the plain meaning instruction, there was no resulting prejudice.

### B.

■ South Carolina law provides a capital defendant with the right, invoked by request, to a jury instruction at sentencing that "the term life imprisonment is to be understood in its ordinary and plain meaning." *Southerland v. State*, 337 S.C. 610, 524 S.E.2d 833, 835 (1999). The instruction is available even if the defendant might become eligible for parole, and a trial court's refusal to grant a request for the instruction is reversible error on direct appeal. *Id.* at 834. The purpose of the plain meaning instruction is to ensure that the jury understands its sentencing options (life imprisonment or death) without speculating about the possibility of parole. *See State v. Norris*, 285 S.C. 86, 328 S.E.2d 339, 344 (1985).

■ Because a South Carolina capital defendant's right to the plain meaning instruction is so well entrenched, the state supreme court concluded that Williams's trial counsel rendered substandard (deficient) performance when he failed to request the instruction. Instead of asking for a plain meaning instruction, counsel's initial strategy was to ask for a parole eligibility instruction to advise the jury that, if it opted for a life sentence, Williams would be eligible for parole in

thirty years. Counsel explained at the PCR hearing that he requested the parole eligibility instruction to enable the jury to understand that a life sentence meant "more than five or ten or fifteen years." J.A. 63. The trial court refused the parole eligibility instruction, which is not required to be given at the defendant's request. *See McWee v. State*, 357 S.C. 403, 593 S.E.2d 456, 457 (2004). Williams's counsel did not follow up with a request for the plain meaning instruction. As the South Carolina Supreme Court observed, counsel acknowledged that he had no strategic or tactical reason for not requesting the plain meaning instruction. He admitted that he believed the trial court would give the plain meaning instruction as a matter of course; and when it was not given, it did not occur to him to raise the issue with the court.

In these circumstances the Supreme Court of South Carolina did not unreasonably apply *Strickland*'s performance standard. Williams's counsel was well aware of the plain meaning instruction and of its availability upon request. He surely knew that the instruction would have furthered his goal of making the jury aware that a life sentence would in all events result in a long prison term, and he could not provide a satisfactory explanation for his failure to ask for the instruction. Thus, the state supreme court reasonably concluded that the representation provided by Williams's counsel was deficient under *Strickland*'s performance standard, that is, it fell below an objective standard of reasonableness as measured by prevailing professional norms. *See Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.

■ After determining that Williams's counsel was deficient in his performance, the Supreme Court of South Carolina considered whether counsel's substandard performance prejudiced the defense. The state supreme court's analysis focused first on why the PCR court had erred in concluding that *Strickland*'s prejudice requirement was satisfied. The PCR court believed that, without the plain meaning instruction, Williams's defense at the sentencing phase was prejudiced because: (1) the state relied largely on its circumstantial proof in the guilt phase to establish the statutory aggravating factors in the sentencing phase; (2) Williams had no prior criminal record; and (3) he was released on bond prior to trial. The state supreme court, after "carefully consider[ing]" the trial record, concluded that Williams was not "prejudiced by the lack of a plain meaning charge." J.A. 187.

In the sentencing phase the jury found two statutory aggravating factors that allowed it to recommend that Williams be sentenced to death for each murder: (1) Williams committed each murder for the purpose of receiving money or a thing of monetary value, and (2) he murdered two or more persons by one act or pursuant to one scheme or course of conduct. The Supreme Court of South Carolina concluded that strong evidence, "albeit circumstantial," supported the jury's finding of the two statutory aggravating factors. J.A. 187. The state supreme court recounted this evidence as follows.

Williams and his wife had been experiencing significant martial problems, and they were in dire financial straits; they had recently declared bankruptcy, and foreclosure proceedings had been initiated against their home. In the month before the murders, Williams had substantially increased life insurance coverage on his wife and son, naming himself beneficiary. Williams forged his wife's signature on forms that added vehicle-related death benefits under family automobile policies. The bodies were found in the family van, which had been partially burned. Right

after the murders Williams displayed injuries to his right hand (severe bruising and swelling) that were consistent with the beating (or blunt head trauma) that killed his wife. The son's death was due to strangulation. After the murders, but before Williams received the autopsy results, he accurately described the causes of the deaths to a friend, stating that his wife had been beaten to death and that his son had been strangled by a plastic wire wrap. From this evidence the Supreme Court of South Carolina concluded that the jury "found [Williams] planned in cold blood the deaths of his child and his wife, making arrangements to benefit financially." J.A. 188. The gist of the state supreme court's analysis of the factual record is that the strong evidence supporting the two statutory aggravating factors—two murders, both committed for financial gain—weighs in favor of the conclusion that Williams was not prejudiced by the lack of a plain meaning instruction. *See Strickland*, 466 U.S. at 696, 104 S.Ct. 2052 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

The Supreme Court of South Carolina then considered the two items of mitigating evidence considered by the state PCR court, specifically that Williams was released on bond (and met his bond conditions) prior to his convictions and that he had no prior criminal record. The state supreme court indicated that the lack of a plain meaning instruction did not affect the jury's consideration of these two mitigating factors. First, the state supreme court found it unsurprising that Williams met the conditions of his bond. After all, the court said, Williams "ha[d] achieved what he set out to accomplish," that is, the death of his wife and son and the prospect of substantial life insurance or death benefits. J.A. 188. Second, the court concluded that "given the nature of [Williams's] crimes ... the fact that he had no prior criminal record [is] irrelevant to the question whether he was prejudiced by the lack of a 'plain meaning' charge." *Id.* Here, the court was referring to "the evidence demonstrat[ing] that [Williams's] motives were financial gain and the elimination of his domestic [or financial] problems." *Id.* It was the depraved motive of financial gain that allowed the jury to find one of the aggravating factors that triggered the recommendation of death. The state supreme court thus indicated by its evaluation that the aggravating factors outweighed the mitigating factors by a significant degree.

The Supreme Court of South Carolina concluded its analysis of *Strickland*'s prejudice factor by considering whether there was anything "in th[e] record to indicate that the jurors in [Williams's] capital trial were concerned with parole eligibility, or confused about the meaning of a life sentence." J.A. 188. The court found nothing, and the record supports that determination. First, the aggravating factors found by the jury (two murders and a financial motive) are not ones that indicate that the jury was concerned about how long Williams would serve if he received a life sentence or whether he would be a danger to society if he was paroled at some future date. It appeared to be solely the nature of, and the motive behind, Williams's crimes that triggered the jury's recommendation of death. Second, there is no indication in the record that a plain meaning instruction would have prompted the jury to give more weight to the mitigating evidence. The aggravating factors—a double murder planned in cold blood for financial gain—simply outweighed the mitigating factors, such as bond compliance and lack of a prior criminal record.

The Supreme Court of South Carolina thus concluded that there was no reasonable probability that, had a plain meaning instruction been given to Williams's sentencing jury, the jury would have concluded that the balance of aggravating and mitigating factors did not warrant the death sentence. This decision, we conclude, did not involve an unreasonable application of *Strickland.* Of course, the district court concluded that the decision of the Supreme Court of South Carolina was contrary to, or involved an unreasonable application of *Strickland,* in four respects. We will evaluate the district court's decision and explain why that court's reasoning does not provide a sufficient basis under 28 U.S.C. § 2254(d)(1) to set aside the state court determination.

First, the district court said that the Supreme Court of South Carolina's determination that Williams's lack of a prior criminal record was irrelevant to the prejudice question is contrary to *Strickland,* which required the state court to consider the "totality of the evidence." *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052; *see also Eddings v. Oklahoma,* 455 U.S. 104, 114–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (sentencer may not be precluded from *considering* any mitigating factor). The state supreme court did not exclude Williams's clean record from its consideration of the prejudice factor. Rather, the state supreme court weighed Williams's lack of a prior record against the cold-blooded and brutal nature of the murders and the aggravating factors of financial motive and a double murder; only then did the court conclude that the lack of a prior record was irrelevant to the prejudice question. The court was thus saying that the aggravating factors were so significant that the addition of a plain meaning instruction would not have transformed Williams's clean record—which the jury was instructed to consider in mitigation—into a factor that outweighed William's depraved motive and his cold-blooded planning and execution of the murders.

■ Second, the district court noted that the Supreme Court of South Carolina, in concluding that the lack of a plain meaning instruction did not prejudice Williams, erred in relying on lack of evidence of juror concern about parole eligibility under a life sentence. The district court believed that the state court's reliance on this factor was contrary to the U.S. Supreme Court decisions in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *Shafer v. South Carolina,* 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001); and *Kelly v. South Carolina,* 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002). These decisions require a state court, as a matter of due process, to instruct a capital sentencing jury that a defendant would be ineligible for parole if the prosecution has put the defendant's future dangerousness in issue, and the only sentencing alternative to death is life imprisonment without the possibility of parole. *See, e.g., Shafer,* 532 U.S. at 51, 121 S.Ct. 1263. *Kelly* made clear that a court must give a parole ineligibility instruction under these circumstances regardless of whether the jury indicates concern about parole. 534 U.S. at 256–57, 122 S.Ct. 726. Neither *Kelly* nor any other Supreme Court case has considered the question raised by the district court—whether a state court may rely on the absence of evidence of juror concern or confusion about parole eligibility or the meaning of a life sentence in considering whether the lack of a plain meaning instruction prejudiced the defense. Again, the purpose of South Carolina's plain meaning instruction is to ensure that a capital jury understands its sentencing options (life imprisonment or death) without speculating about the possibility of parole.

It is not unreasonable for a court, in reviewing a record for prejudice resulting from lack of a plain meaning instruction, to look for signs of juror confusion about parole eligibility or the meaning of a life sentence. In any event, the Supreme Court of South Carolina in Williams's case did not act contrary to, or unreasonably apply any U.S. Supreme Court precedent, when it relied on the lack of evidence of juror confusion about the consequences of the sentencing options.

Third, the district court concluded that the state supreme court, in conducting its prejudice analysis, unreasonably failed to consider the likely effect of statements made by the prosecution and defense in closing arguments. The prosecutor told the jury that imposing a life sentence on Williams would "pat him on the back" and indicate that Edgefield County "forgave" him. J.A. 376. Defense counsel later told the jury that it would hear a charge that "life [in prison] means the remainder of one's natural life." J.A. 377. This charge never materialized because counsel did not request a plain meaning instruction. The district court concluded that these statements could have confused the jury about the meaning of a life sentence. We disagree. The prosecutor's statement simply reflected the view that a death sentence would be the most appropriate punishment. This view was expressed without any mention that parole might be possible under a life sentence. Further, it is not likely that defense counsel prompted the jury to make parole eligibility a deciding factor in its sentencing recommendation when he mistakenly said that a plain meaning instruction would be given. The statements therefore are not of sufficient materiality to allow us to say that the state supreme court was unreasonable in determining that "[t]here is nothing in th[e] record to indicate that the jurors in [Williams's] capital trial were concerned with parole eligibility, or confused about the meaning of a life sentence." J.A. 188.

Fourth, the district court concluded that the Supreme Court of South Carolina's prejudice inquiry involved an unreasonable application of *Strickland* because the court "did not mention" several mitigating factors. These factors included Williams's good behavior during childhood; his many friends in high school, where he was active in sports; his ten-year estrangement from his family as a result of a will contest, and the reconciliation after he was arrested for murder; and his "quiet, withdrawn" nature while an inmate in the Edgefield County Jail. J.A. 379. The district court treated the state supreme court's failure to mention these factors as an indication that the state court did not follow *Strickland*'s directive to "consider the totality of the evidence before the ... jury," including the "aggravating and mitigating circumstances," *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. As we discussed above, the state supreme court specifically mentioned two mitigating factors: that Williams adhered to his bond conditions and obligations and that he had no prior criminal record. Moreover, the state supreme court stated that it had "carefully considered whether the record supports the ... conclusion that [Williams] was prejudiced by the lack of a plain meaning charge." J.A. 187. The state supreme court thus implied that it considered all of the mitigating circumstances, including the unmentioned ones, but ultimately determined there was not a reasonable probability that, had a plain meaning instruction been given, the jury would have concluded that the balance of aggravating and mitigating factors warranted two life sentences instead of death. *See Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. This determination did not involve an unreasonable application of *Strickland*.

For the foregoing reasons the district court's order granting Williams's application for a writ of habeas corpus will be reversed.

## IV.

■ In Williams's direct appeal the Supreme Court of South Carolina rejected his claims that the evidence was not sufficient to support either his convictions or venue in South Carolina. Williams reasserted these claims in his federal habeas petition, and they were also rejected by the district court. He cross-appeals this aspect of the district court's decision.

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a [state] criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (quotation marks and citation omitted). "To determine whether this due process right has been violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir.2007) (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original)). Now, under the AEDPA provision codified at 28 U.S.C. § 2254(d)(1), "we inquire whether a state court determination that the evidence was sufficient to support a conviction was an 'objectively unreasonable' application of [the standard enunciated in] *Jackson*." *Id.*

## A.

■ South Carolina defines murder as "the killing of any person with malice aforethought." S.C.Code Ann. § 16–3–10. In rejecting Williams's claim that the evidence was insufficient for a jury to find guilt beyond a reasonable doubt, the Supreme Court of South Carolina began by focusing on the evidence that demonstrated Williams's motive and planning. He and his wife were experiencing severe financial difficulties, as evidenced by their bankruptcy and the foreclosure on the family home; neighbors regularly overheard loud arguments between Williams and his wife; and he substantially increased the life insurance coverage (naming himself the beneficiary) on his wife and son a month before the murders. Immediately after the murders, Williams's right hand was severely bruised, and the injury marks on his wife's body were consistent with injuries that would be inflicted in a beating with a human fist. Finally, Williams described the methods that were used to murder his wife and son before he received the autopsy results. This evidence, along with the other evidence recited in the statement of facts, *see* part I *supra*, was sufficient for any rational trier of fact to find Williams guilty, beyond a reasonable doubt, of murdering his wife and son.

## B.

■ South Carolina law requires a murder indictment to specify the place of the victim's death for purposes of establishing venue and providing adequate notice to the defendant. *See* S.C.Code Ann. § 17–19–30; *State v. Brisbon*, 323 S.C. 324, 474 S.E.2d 433, 436 (1996) (quoting *State v. Bostick*, 243 S.C. 14, 131 S.E.2d 841, 842 (1963)). Williams's jury was thus instructed that the state was required to prove beyond a reasonable doubt that the murders occurred in Edgefield County, South Carolina, as alleged in the indictment. Williams contends here, as he did

in his direct appeal, that there was insufficient evidence to support a finding that the murders occurred in Edgefield County rather than in Georgia. The factual issue of where the murders occurred is a close one to be sure. The evidence would have allowed the jury to find that the victims were murdered in either Edgefield County, South Carolina, or in Georgia. The jury nevertheless found that the deaths occurred in Edgefield County. An objectively reasonable application of the *Jackson* standard requires that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781. The Supreme Court of South Carolina pointed to evidence that supported the jury's determination that the murders occurred in South Carolina: the victims were dressed in a way that suggested they were forced from their home suddenly while still alive; their bodies were found in South Carolina; and Williams signed insurance claim forms conceding that his wife and son had died in Edgefield County. The state supreme court's conclusion that there was sufficient circumstantial evidence to support the inference (and a finding beyond a reasonable doubt) that the victims died in South Carolina was not objectively unreasonable under the standards enunciated in *Jackson*.

## V.

For the reasons stated in part III of this opinion, the district court's order issuing a writ of habeas corpus for Luke A. Williams, III, is reversed. For the reasons stated in part IV, the district court's determination that the writ cannot be granted on the grounds that the evidence was insufficient to establish guilt or venue is affirmed.

*REVERSED IN PART AND AFFIRMED IN PART*