[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12716

_____

D.C. Docket No. 9:06-cr-80171

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DANIEL TROYA,
RICARDO SANCHEZ, JR.,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 2, 2013)

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

WILSON, Circuit Judge:

The present appeal arises from the murder of a family on the side of a Florida turnpike that, after a trial in the United States District Court for the Southern District of Florida, resulted in a sentence of death for Appellants Daniel Troya and Ricardo Sanchez, Jr. (Appellants).  Appellants now contest several of the district court's rulings.

Specifically, Appellants contend that: (1) the district court's voir dire was insufficient to identify unqualified jurors; (2) the district court did not properly permit Appellants to exercise peremptory challenges during jury selection; (3) the district court erred in rejecting several of Appellants' *Batson* challenges;[1] (4) the district court erred in admitting into evidence at trial uncharged acts of misconduct involving firearms and drug trafficking; (5) the district court erred in admitting into evidence at trial redacted versions of statements made by Troya; (6) the district court wrongly excluded expert testimony from forensic psychologist Dr. Mark Cunningham during the penalty phase concerning Troya's lack of future dangerousness; (7) the district court erred in excluding from evidence in the penalty phase execution-impact testimony; (8) the evidence presented at trial was insufficient to support the aggravating factors justifying the death penalty; (9) the prosecutor's remarks in the penalty phase during closing argument were improper;

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986) (holding unconstitutional prosecutor's use of peremptory challenges in a criminal case to exclude jurors solely based on race).

2

(10) the district court erred during the penalty phase in its jury instructions; (11) the district court erred in admitting testimony based on Sanchez's statements to government psychologist Dr. Michael Brannon; and (12) the multitude of errors in the guilt and penalty phases rendered Appellants' trial and sentencing hearings unfair.

Because we find no merit to the majority of these arguments and accordingly have no need to discuss them, we focus our attention on three: the district court's evidentiary rulings as to acts of misconduct involving firearms and drugs, the exclusion of Dr. Cunningham's testimony concerning Troya's lack of future dangerousness, and the admission of Dr. Brannon's testimony concerning Sanchez's mental state.

## I. Background

In 2009, Appellants were sentenced to death for the murder of three-year-old Luis Damian Escobedo and four-year-old Luis Julian Escobedo.[2]  They were sentenced to life imprisonment for the murder of the children's parents, Jose Luis Escobedo and his wife Yessica Escobedo.  These murders took place to protect a large-scale drug trafficking ring involving drugs, guns and extensive violence. Appellants' drug organization allegedly owed a drug debt to Jose Luis Escobedo.

---

[2] We address the underlying facts of this case only as they apply to the issues discussed *infra*.  We provided a comprehensive version of the factual circumstances in *United States v. Lopez*, 649 F.3d 1222, 1226–31 (11th Cir. 2011).

3

On February 14, 2008, a federal grand jury in the Southern District of Florida returned a 16-count third superseding indictment against Appellants for crimes including non-capital drug trafficking and firearms offenses, and capital offenses involving the deaths of the Escobedo family members.[3] The charges included: conspiring to possess with intent to distribute at least 50 grams of crack cocaine and at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a) and 846 (Count 1); conspiring to carjack a motor vehicle, which resulted in death, in violation of 18 U.S.C. §§ 371 and 2119(3) (Count 5); taking a motor vehicle from a person by force and violence which resulted in death, in violation of 18 U.S.C. § 2119(3) and 18 U.S.C. § 2 (Count 6); use of a firearm, during and in the course of committing a crime of violence and a drug trafficking crime, causing the death of a person by murder, in violation of 18 U.S.C. §§ 924(j)(1), 1111, and 18 U.S.C. § 2 for the murder of Luis Damian Escobedo (Count 7), the murder of Luis Julian Escobedo (Count 8), the murder of Yessica Guerrero Escobedo (Count 9), and the murder of Jose Luis Escobedo (Count 10); possessing with intent to distribute at least 50 grams of crack cocaine and at least 500 grams of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (B), and 18

---

[3] This indictment also carried charges against Appellants' co-defendants, Daniel (Danny) Varela and Liana Lopez, whose appeal we recently decided. *See Lopez*, 649 F.3d at 1243. We focus only on the charges as they pertain to Appellants.

4

U.S.C. § 2 (Count 4 (Sanchez Only) and Count 13); possessing firearms after previously having been convicted of a felony offense, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 18 U.S.C. § 2 (Count 3 (Troya only) and Count 14); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 15).

After a two month trial that began in January 2009, a jury found Appellants guilty on all counts. At the conclusion of the penalty phase in March 2003, the jury recommended the death penalty for the murder of the two Escobedo children, and life imprisonment without the possibility of parole on Counts 6, 9, and 10. The district court imposed the jury's findings on May 13, 2009, with the life sentences to run consecutively to all other sentences.[4]

## II. Discussion

### A. Evidentiary Rulings

Appellants contend that the district court erred in admitting into evidence at trial uncharged acts of misconduct involving firearms and drug trafficking. The government introduced evidence of four acts of misconduct by Appellants involving firearms: (1) shooting into a residence on Suwanee Drive in April 2006;

---

[4] The district court also sentenced Appellants to concurrent terms of life imprisonment on Counts 1 and 13, 60 months' imprisonment on Counts 5 and 14 and a consecutive term of 60 months' imprisonment on Count 15. Appellants were sentenced to a total term of 60 months' supervised release and a special assessment of $1,100. Sanchez also received a concurrent term of 480 months' on Count 4.

5

(2) shooting into a residence on Mercer Avenue on the same date; (3) shooting into a car on Haverhill Road in September 2006; and (4) an attempted home invasion in October 2006. The district court admitted this evidence on the premise that it was direct evidence of a charged offense, intrinsic evidence of a charged offense, or extrinsic evidence admissible under Federal Rule of Evidence 404(b). We review a district court's evidentiary rulings for abuse of discretion. *See United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008). Likewise, we have emphasized that "the district court is uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like probativeness and prejudice, and we are loathe to disturb the sound exercise of its discretion in these areas." *United States v. Jernigan*, 341 F.3d 1273, 1285 (11th Cir. 2003).

Relevant direct evidence of a crime charged is always admissible unless it falls under a rule of exclusion. *See United States v. Rice*, 214 F.3d 1295, 1299 (11th Cir. 2000); *United States v. Martin*, 794 F.2d 1531, 1533 (11th Cir. 1986) (per curiam). Relevant evidence "has [a] tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. "The evidence must be probative of the proposition it is offered to prove," and the proposition "must be one that is of consequence to the determination of the action." *United States v. Glasser*, 773 F.2d 1553, 1559 n. 4 (11th Cir. 1985). In addition, what we deem intrinsic evidence is admissible if it is "(1) an uncharged

6

offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (internal quotation marks omitted). Specifically,

> [e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive[,] and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

*Id.* (second alteration in original) (internal quotation marks omitted). Evidence is inextricably intertwined if it is an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989) (internal quotation marks omitted).

Lastly, evidence of other acts that is extrinsic to a charged offense is generally inadmissible unless it is "relevant to an issue other than the defendant's character[, and] . . . there [is] sufficient proof so that a jury could find that the defendant committed the extrinsic act." *Jernigan*, 341 F.3d at 1280 (internal quotation marks omitted). Rule 404(b) provides that

> [e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[, however] . . . [t]his evidence may be admissible for another purpose, such as proving motive,

7

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

When Rule 404(b) evidence is "central to the prosecution's case" it should not lightly be excluded. *Id.* (internal quotation marks omitted). All admissible evidence, whether intrinsic or extrinsic, must be weighed against Rule 403 prejudice. *See id.*; *United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000); *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992). Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Exclusion under Rule 403 "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010) (internal quotation marks omitted).

The district court held that while the Suwanee Drive and Mercer Avenue shootings were not intrinsic to any charged offense, they were admissible under Rule 404(b) to show Appellants' intent to possess firearms as related to the firearms charges in the indictment. We agree that both of these incidents were "relevant" to an issue other than Appellants' characters, that there was "sufficient proof" of the incidents, and that the probative value of the evidence was not outweighed by any undue prejudice. *See Jernigan*, 341 F.3d at 1280. As to the

8

third prong, the court explicitly provided the jury with the limiting instruction that it could not consider the Suwanee Drive and Mercer Avenue shootings in initially determining whether Appellants had committed any of the charged offenses; rather the jury had to first conclude beyond a reasonable doubt that they had committed the offenses from other record evidence.

The court next held that both the Haverhill Road shooting and the attempted home invasion were admissible as part and parcel of the drug conspiracy. The court explained that if its ruling to this end was erroneous, then these incidents were alternatively admissible under Rule 404(b) "to establish intent to engage in a charged conspiracy." We agree that the Haverhill Road shooting was admissible as intrinsic evidence of the charged drug conspiracy and that the attempted home invasion was direct evidence of the charged drug conspiracy. The Haverhill Road shooting was done to protect the Appellants' extensive drug operation, the conspiracy charged in this case, and thus was "inextricably intertwined with the evidence regarding the charged offense." *Edouard*, 485 F.3d at 1344. The attempted home invasion was direct evidence of Appellants' conspiracy to possess with intent to distribute cocaine. The home invasion established the method by which Appellants obtained drugs to distribute as part of the larger drug ring at issue in the present case. Furthermore, both the Haverhill Road shooting and the attempted home invasion occurred within the time frame of the charged crimes.

9

Alternatively, as the district court properly concluded, both incidents would have also been admissible under Rule 404(b).  Neither of these offenses' admissibility was outweighed by Rule 403 prejudice.  Evidence of these two uncharged acts established the underpinnings of the drug trafficking ring, and the lengths to which Appellants would go to protect it.  We have long held that "[g]uns and violence go hand-in-hand with illegal drug operations." *United States v. Hromada*, 49 F.3d 685, 689 (11th Cir. 1995).  Furthermore, given the gravity of the charged capital offenses and the overwhelming evidence of Appellants' guilt, this evidence was not unfairly prejudicial.

Finally, the government presented evidence through two cooperating witnesses of drug transactions as proof of the expansive drug trafficking operation involved in the present case.  The district court admitted this testimony as intrinsic evidence that was inextricably intertwined with the evidence of the charged offenses and completed the story of the crime.  In the alternative, the court held that the evidence was admissible under Rule 404(b) as proof of intent to engage in drug trafficking during the period of the conspiracy.  Sanchez alone appeals the court's admission of this evidence.  We agree that the drug transactions were intrinsic to the charged crimes, crucial to "explaining the context, motive, and set-up of the . . . charge and w[ere] necessary to complete the story of the crime for the

10

jury." *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992).

Moreover, their admission was not unfairly prejudicial under Rule 403.[5]

Therefore, the district court did not abuse its discretion in its admission of the uncharged firearms and drug trafficking offenses.

### B. The Exclusion of Dr. Cunningham's Testimony

Troya argues that the district court erred in excluding expert testimony from Dr. Cunningham, a forensic psychologist, during the penalty phase of the trial. In a pretrial notice, the government listed Troya's future dangerousness as an aggravating factor that the government intended to prove as justifying a sentence of death. After reviewing Dr. Cunningham's report as to Troya's lack of future dangerousness, however, the government withdrew that aggravating factor before the penalty phase. Troya contends that Dr. Cunningham's testimony was admissible to rebut future dangerousness put at issue by the government, and also as mitigating evidence. The government argues that because future dangerousness was withdrawn as an aggravating factor, there was nothing for Troya to rebut. The

---

[5] The two witnesses in this case testified that they had been dealing drugs continuously with Sanchez and his-codefendants during the course of the conspiracy as well as in the months preceding the conspiracy. In *Lopez*, we addressed a similar circumstance insofar as it pertained to the co-defendants and held that the pre-conspiracy dealings and the charged-conspiracy dealings were all a part of the same ongoing relationship, involving the same conspirators, and evidence of the pre-conspiracy dealings was therefore necessary to help explain their ongoing relationship. 649 F.3d at 1248. Here too, the pre-conspiracy dealings between Sanchez and his co-conspirators helped explain their relationship when the conspiracy began and how they came to be trading together in large amounts of cocaine during the course of the conspiracy.

11

government also maintains that Dr. Cunningham's testimony was not mitigation evidence because its substance and purpose were not specific to Troya. We agree with Troya that the district court abused its discretion in excluding Dr. Cunningham's testimony on Troya's lack of future dangerousness. That error, however, was harmless beyond a reasonable doubt.

"[C]riminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984). This includes "a meaningful opportunity [for criminal defendants] to present a complete defense." *Id.* The Federal Death Penalty Act provides that a defendant should be "permitted to rebut any information received at the hearing." 18 U.S.C. § 3593(c). "[I]n capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Smith v. Singletary*, 61 F.3d 815, 817 (11th Cir. 1995) (per curiam) (alteration in original) (internal quotation marks omitted); *see also Jones v. United States*, 527 U.S. 373, 381, 119 S. Ct. 2090, 2098 (1999) (holding that "a scheme must allow a broad inquiry into all constitutionally relevant mitigating evidence" (internal quotation marks omitted)); *Hitchcock v. Dugger*, 481 U.S. 393, 398–99, 107 S. Ct. 1821, 1824 (1987) (finding a death sentence invalid where "the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances").

Evidence regarding a capital defendant's lack of future dangerousness has long been viewed by the Supreme Court as admissible "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty." *Skipper v. South Carolina*, 476 U.S. 1, 5 n.1, 106 S. Ct. 1669, 1671 n.1 (1986). In those circumstances, "the defendant [must] be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death on the basis of information which he had no opportunity to deny or explain." *Id.* (internal quotation marks omitted). The Supreme Court extended that principle in *Simmons v. South Carolina* to instances where "[t]he State [only] raised the specter of petitioner's future dangerousness generally," rather than listing it as an aggregator. 512 U.S. 154, 165, 114 S. Ct. 2187, 2194 (1994) (plurality opinion) (holding that the capital defendant was entitled to inform the jury of his parole ineligibility where the state placed future dangerousness at issue). The Court held that a defendant must be afforded an opportunity to "deny or explain" the generalized future dangerousness of the defendant. *Id.* at 164, 114 S. Ct. at 2194 (internal quotation marks omitted). Then, in *Kelly v. South Carolina*, the Court further held that a capital defendant is entitled to rebut future dangerousness even when it is merely implied by the evidence presented at trial, rather than explicitly argued. 534 U.S. 246, 252–57, 122 S. Ct.

13

726, 731–33 (2002) (holding that a capital defendant has right to rebut future dangerousness that the government has put "at issue" in the case).

We review the erroneous exclusion of mitigating evidence—known as a *Hitchcock* error[6]—for harmlessness "beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967); *see United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006) (per curiam) ("Errors in contravention of . . . constitutional rights must be found harmless beyond a reasonable doubt or an otherwise valid conviction will be set aside."); *Jones v. Dugger*, 867 F.2d 1277, 1279 (11th Cir. 1989). In determining the harmlessness of the error, "we must consider all potential mitigating evidence that would have been presented, but for the *Hitchcock* error." *Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1202 (11th Cir. 2009) (alteration and internal quotation marks omitted). Trial errors are subject to harmless error review, whereas structural errors require automatic reversal. *Arizona v. Fulminante*, 499 U.S. 279, 307–312, 111 S. Ct. 1246, 1264–1266 (1991). Structural errors are "structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards." *Id.* at 309, 111 S. Ct. at 1265 (internal quotation marks omitted). Trial errors, however, can "be quantitatively assessed in the context of other evidence

---

[6] 481 U.S. at 398–99, 107 S. Ct. at 1824.

presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307–08, 111 S. Ct. at 1264.

Here, the government indubitably put Troya's future dangerousness at issue. First, we stress that "capital cases will [inherently] show a defendant likely to be dangerous in the future." *Kelly*, 534 U.S. at 264, 122 S. Ct. at 737 (Thomas, J., dissenting) (internal quotation marks omitted). Regardless, through the introduction of extensive evidence, the government expended much effort to establish that Troya was a tremendously dangerous individual. The government introduced evidence, as discussed in subsection *A*, of four separate uncharged firearms offenses, including two drive-by shootings. The government showed that Troya possessed an AK-47 and stated that he was, prior to his incarceration, armed and dangerous at all times, with access to an "arsenal of weapons, a mountain of ammunition, and any weapon of [his] choice." The government discussed Troya's violent past through the introduction of evidence of multiple assaults: one, a felony battery where he punched a friend's mother in the face and another, an alleged assault on his previous girlfriend.

After a lengthy two-week trial where the jury learned of Troya's attempted prison escape and various acts of violence, the government, in closing, stated "[i]s it really pushing credulity to believe that a killer like Daniel Troya could execute an entire family?" Troya, the government argued, was a "brutal career criminal"

15

and "evil."  Troya had "committed himself to a life of unrepentant violence," and was "the personification of violence [and] . . . brutality."  Troya, the government emphasized, is "not [an] innocent law abiding" citizen, but a man who "doesn't care who he hurts, when he hurts them, or how he hurts them."  The government consistently underscored one point throughout trial: Troya's "unmitigated violence against anybody and everybody."

The government argues that the numerous references to Troya's propensity towards violence were to demonstrate Troya's past conduct and moral culpability; "[b]ut the import of the argument simply cannot be compartmentalized this way." *Id.* at 255, 122 S. Ct. at 732.  "[E]vidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." *Id.* at 254, 122 S. Ct. at 732.  The impact of this evidence upon the jury in the present case is manifest: if the jury did not sentence Troya to death, he would be just as lawless in the future.  It is obvious to us that "[t]he prosecutor accentuated the clear implication of future dangerousness raised by the evidence," *id.* at 255, 122 S. Ct. at 732, from which the jury undoubtedly made a "logical inference," *id.* at 252, 122 S. Ct. 731 (internal quotation marks omitted).  "A jury hearing evidence of a defendant's propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked

16

up or free . . . ." *Id.* at 253–54, 122 S. Ct. at 731. Consequently, Troya had a right to rebut this evidence with Dr. Cunningham's testimony. *See United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) ("[T]he purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party." (internal quotation marks omitted)).

Dr. Cunningham's testimony was also admissible as non-statutory mitigating evidence. *See* 18 U.S.C. § 3592(a)(8); *Skipper*, 476 U.S. at 5, 106 S. Ct. at 1671 (holding that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating"); *Jurek v. Texas*, 428 U.S. 262, 276, 96 S. Ct. 2950, 2958 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."), *overruled on other grounds by Abdul–Kabir v. Quarterman*, 550 U.S. 233, 258, 127 S. Ct. 1654, 1657 (2007). Moreover, character evidence is always relevant as long as a proper foundation for its admission is laid. *Jones*, 867 F.2d at 1279 (holding that "a jury in a capital case [can] not be precluded from considering, as a mitigating factor, *any* aspect of a defendant's character or record that the defendant proffers as a basis for a sentence less than death" (emphasis in original)). Because "a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system," we find that the district court

17

abused its discretion by excluding Dr. Cunningham's testimony.  *Simmons*, 512 U.S. at 162, 114 S. Ct. at 2193.

Although we fail to understand why the government omitted this argument in its brief, we need not vacate Troya's sentence because any error resulting from the exclusion of Dr. Cunningham's testimony was harmless.[7]  *See United States v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993) (stating that "[t]he Government did not argue harmless error in its brief on appeal, but this Court may consider the harmlessness of a trial court's error where it has not been briefed by the Government").  This case involves a gangland-style murder of two children.  On October 13, 2006, three-year-old Luis Damian Escobedo drowned in his own blood after being shot through the heart on the side of the highway.  His brother, four-year-old Luis Julian Escobedo, was killed by a close-range bullet to the head.  Yessica Escobedo writhed on the ground in a last-ditch effort to protect her children.  In this gruesome quadruple homicide, Appellants stalked the Escobedo family on a Florida highway for nearly nine hours, personally spoke to them, and then ruthlessly murdered them one-by-one, execution style.

Cell phone tower records showed that Appellants drove up the East Coast of Florida on I-95 north the night of October 12, 2006.  Jose Luis Escobedo and his

---

[7] We note that this was not an 18 U.S.C. § 3595(c)(2) structural error.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S. Ct. 2557, 2563–2564 (2006).

family did the same.  Over the span of that evening, multiple calls were made between Appellants and Jose Luis Escobedo's cell phones.  Around midnight, cell phone towers registered a change in direction, and all three cell phones appeared to travel back down I-95 south.  At 2:18 a.m. on October 13, toll booth security cameras showed both Appellants' van and the Escobedo's jeep enter the Florida Turnpike immediately after one another.  Approximately six minutes later, a couple that lived nearby was awakened by the popping sound of gunshots.  At 2:27 a.m., Troya's cell phone made a call to Sanchez's cell-phone, registering the first call between the two phones all night.  Around that same time, calls were also made from both phones to Varela's cell phone.

At 3:01 a.m. and 3:02 a.m., toll booth footage and toll tickets showed Appellants' van and the Escobedo's jeep exit the turnpike.  Troya's palm prints were found on the toll ticket belonging to one vehicle, and Sanchez's prints were found on the other.  While the Escobedo's jeep made it off of the turnpike, the Escobedos did not.  Their bodies were discovered the morning of October 13, when a highway traveler stopped to assist what he thought was a sleeping family on the side of the road.  He first believed that there were only three bodies, including what looked like a mother holding a child.  He soon discovered the fourth tiny victim behind Yessica Escobedo's leg.  The traveler dialed 911.

It is when we compare this backdrop and the record in its entirety to Dr. Cunningham's proposed testimony that we conclude its exclusion was harmless beyond a reasonable doubt. *See Ferguson*, 580 F.3d at 1202 (holding that even if the unconsidered evidence had been admitted, it "would not [have been] enough to alter the outcome [of the trial] in the face of the aggravating circumstances"); *Knight v. Dugger*, 863 F.2d 705, 732 (11th Cir. 1988). All that Dr. Cunningham would have been able to say if he were permitted to testify on Troya's behalf is that: (1) Troya had received his GED, which statistically lowered the rate of risk of violence in prison; (2) Troya's age of 25 lessened his risk of violence in prison; (3) Troya was likely to make a positive adjustment to prison based on his frequent familial visits; and (4) Troya had been safely managed, notwithstanding his escape attempt, during previous stints of incarceration. We are unable to say that this evidence is "substantial and significant," *Delap v. Dugger*, 890 F.2d 285, 305 (11th Cir. 1989), given "the totality of the circumstances" weighed by the jury when it recommended that Troya be sentenced to death for the murder of the two Escobedo boys, *id.* at 306.

At sentencing, the jury recommended life sentences for three of the capital counts: the carjacking conviction (Count 6) and the conviction for use of firearms resulting in the deaths of Yessica Escobedo (Count 9) and Jose Luis Escobedo (Count 10). It was only for Counts 7 and 8, the murders of Luis Damian and Luis

20

Julian respectively, that the jury recommended the sentence of death to Troya. For all five capital counts, the jury unanimously recognized four statutory aggravating factors. The jury found that Troya substantially planned and premeditated the murders, committed the four murders for pecuniary gain, intentionally killed multiple victims in a single criminal episode, and that the children were particularly vulnerable given their youth (only aggravating for Counts 6, 7, and 8). The jury also found three non-statutory aggravating factors for each of the capital counts. The jury held that Troya participated in other uncharged acts of serious violence, caused serious harm and loss to the victim's surviving family members, and murdered the two Escobedo boys with the intent of eliminating potential witnesses.

In mitigation, the jury considered evidence related to Troya's background, including evidence: that Troya had family that loved him and with whom he maintained relationships; that Troya experienced trauma and loss in his teenage years; that Troya never received grief counseling for this trauma; that Troya's uncle was a negative influence; that Troya's codefendant Danny Varela was not facing murder charges or the death penalty; that victim Jose Luis Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's death; and Troya's prior record.

21

After analyzing all aggravating and mitigating factors weighed by the jury, we are confident that there is not a "reasonable possibility" that the inclusion of Dr. Cunningham's testimony would have changed the jury's conviction. *Chapman*, 386 U.S. at 23, 87 S. Ct. at 827 (internal quotation marks omitted). In fact, it is apparent that the jurors concluded Troya *could be* safely managed in prison, given the life sentences imposed for three of the capital offenses. We surmise that the jurors placed great weight in mitigation on Jose Luis Escobedo's contributing criminal conduct.

Yet, the jury drew a line in the sand when it came to the cold-blooded murder of the Escobedo children. When contrasting the premeditated slaying of two vulnerable children for the purposes of witness elimination and pecuniary gain with *any* of the mitigation evidence put on by Troya, the harmlessness of the error is apparent. The thrust of Dr. Cunningham's testimony was that Troya could be safely managed in prison given a variety of factors supported by statistical data. We cannot say that a reasonable jury would change its vote of death for the murder of the Escobedo children to life imprisonment based on this testimony. *See Demps v. Dugger*, 874 F.2d 1385, 1391 (11th Cir. 1989) (finding harmless error beyond a reasonable doubt where "the evidence excluded from the jury's consideration would not have affected its sentencing recommendation"); *Clark v. Dugger*, 834

22

F.2d 1561, 1569 (11th Cir. 1987) (stating that the error "could not have affected" the defendant's sentence).

Accordingly, we conclude that the evidence against Troya in the present case was "so overwhelming" that the exclusion of Dr. Cunningham's lack of future dangerousness testimony was harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 254, 89 S. Ct. 1726, 1728–29 (1969). Thus, despite the government's failure to even mention the possibility of harmless error in its brief, we provide Troya no relief on this issue.

### C.   The Admission of Dr. Brannon's Testimony

Finally, Sanchez claims that the district court erred in admitting the testimony of Dr. Brannon, the government's psychologist, in violation of Federal Rule of Criminal Procedure 12.2(c)(4) and the Fifth Amendment of the United States Constitution.[8]

Rule 12.2(c)(4)(B) provides:

No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant . . . has introduced

---

[8] Sanchez also argues that the admission of this testimony was in violation of the Sixth Amendment of the United States Constitution. After fully considering this issue, we disagree and find no need to address that argument here.

expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).[9]

It is true that "the purpose of Rule 12.2(c) is to secure the defendant's Fifth Amendment right against self-incrimination." *United States v. Leonard*, 609 F.2d 1163, 1165 (5th Cir. 1980). We have held, however, that "the purpose of rebuttal testimony is to explain, repel, counteract, or disprove the evidence of the Adverse party and if the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution accepting the challenge and attempting to rebut the proposition asserted." *United States v. Delk*, 586 F.2d 513, 516 (5th Cir. 1978) (internal quotation marks omitted). Therefore, "the introduction by the defense of psychiatric testimony constitute[s] a waiver of the defendant's fifth amendment privilege in the same manner as would the defendant's election to testify at trial." *Battie v. Estelle*, 655 F.2d 692, 701–02 (5th Cir. 1981); *see also Powell v. Texas*, 492 U.S. 680, 683–84, 109 S. Ct. 3146, 3149 (1989) (finding that "if a defendant introduces psychiatric testimony to establish a mental-status defense . . . the defendant's use of [this testimony] might constitute a waiver of the Fifth Amendment privilege" (citation omitted)); *Buchanan v. Kentucky*, 483 U.S.

---

[9] Rule 12.2(b)(2) provides:

> If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of punishment in a capital case, the defendant must—within the time provided for filing a pretrial motion or at any later time the court sets—notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk.

402, 423–24, 107 S. Ct. 2906, 2917–18 (1987) (holding that the defendant waived his Fifth Amendment rights when he put forth a mental-status defense); *Copeland v. Washington*, 232 F.3d 969, 976 (8th Cir. 2000) (stating that "the state could rebut [the defense's] expert testimony with its own expert witnesses").

Sanchez put forth a notice listing all mental health experts on whom he intended to rely during the penalty phase. The court then granted the government's request, pursuant to Rule 12.2(c), that Sanchez submit to a mental evaluation by a government expert. Sanchez's counsel requested that this evaluation by the government expert be limited to an I.Q. test rather than a broad psychological test. Sanchez based this request on his alleged intent to limit psychological evidence to the introduction of his I.Q. test results. The court denied this request and allowed testing for "mental health and mental status for purposes of sentencing."

Sanchez then presented two mental health experts during the penalty phase: Dr. Daniel Grant and Dr. Tom Reidy. Dr. Reidy did not interview Sanchez personally, but based his reports on: (1) Sanchez's background reports; (2) Sanchez's self-reports; (3) the testimony of trial witnesses; and (4) Dr. Brannon's report. In Sanchez's self-reports, Sanchez denied that he had ever been abused, denied that he had ever been a victim of battery, denied that he had ever suffered from emotional problems, denied that he had ever been a victim of violence and denied that he lacked close family or friends. At sentencing, Dr. Reidy testified

that he prepared a risk assessment report on Sanchez that identified risk factors related to a person's behavior. He stated that abuse in a person's childhood could be passed down to future generations. To that end, Dr. Reidy opined that Sanchez's behavior was affected by community problems, neighborhood problems, and varying academic problems. He stated "[t]he more you are exposed to risk factors, the greater the probability you will develop the problem . . . [f]amily corruption is a risk factor, major risk factor[]." Dr. Reidy concluded that he detected "family management problems" in Sanchez's childhood home, including domestic violence and lack of familial support.

In rebuttal, the government presented testimony by Dr. Brannon. Dr. Brannon reported that Sanchez denied abuse in his childhood, denied any awareness of a family history of mental health or substance abuse, denied that any domestic violence occurred in his childhood home, denied that he was ever a victim of bullying as a child, denied any prior suicide attempts, denied anger management issues, denied substance abuse problems, and denied any exposure to traumatic events.

Sanchez filed a motion in limine and requested that the court limit Dr. Brannon's testimony to intelligence functioning. Sanchez argued that Dr. Grant and Dr. Reidy's expert testimony was limited to Sanchez's I.Q. and learning disability. The court denied the motion, holding that Dr. Brannon's testimony was

26

proper to rebut both Dr. Grant and Dr. Reidy's findings. Sanchez objected on Fifth and Sixth Amendment grounds, and alleged a Rule 12.2 violation. The court ruled that Dr. Brannon's testimony was admissible to directly rebut Dr. Reidy's testimony that Sanchez impliedly suffered from problems during his childhood. Dr. Brannon subsequently testified during the penalty phase that his mental examination of Sanchez was based on: (1) a clinical interview; (2) a review of the records; (3) Dr. Grant and Dr. Reidy's reports; and (4) psychological testing that included an I.Q. test, a memory test, and a "Personality Assessment Inventory." Dr. Brannon testified that Sanchez exhibited no signs of early childhood family "disturbances," and that Sanchez reported a positive supportive relationship with his family and a "good" childhood.

We agree with the district court that Dr. Brannon's rebuttal testimony was in compliance with Rule 12.2(c)(4), and that Sanchez's Fifth Amendment rights were not violated. Dr. Brannon's testimony was offered solely to rebut the testimony of Sanchez's experts. *See Delk*, 586 F.2d at 516. Nothing in Dr. Brannon's testimony exceeded the scope of the issues upon which Sanchez introduced evidence. *See Frazier*, 387 F.3d at 1269. Sanchez's contention that his experts only introduced testimony as to his intellectual functioning and I.Q. is inaccurate. To the contrary, Sanchez introduced evidence from Dr. Reidy that Sanchez was affected by a lack of prenatal care, a family history of alcohol abuse and domestic

27

violence, restlessness, antisocial behavior, a learning disability, living in a "bad area," academic failure, and concentration problems.  Dr. Reidy specifically identified risk factors in Sanchez's background and explained that they might account for his development.  In closing, Sanchez even employed these identified risk factors to argue that they were contributing factors to which he had been exposed in his early childhood.

Accordingly, we conclude that the district court properly admitted Dr. Brannon's testimony to rebut Sanchez's expert testimony at sentencing.  More explicitly, Dr. Brannon's testimony was admissible under Rule 12.2(c)(4) to directly rebut Dr. Reidy's report and testimony on the issue of Sanchez's mental condition based on certain identified risk factors.

**AFFIRMED.**