[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 16-12909 & 16-17052
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cr-20789-JAL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

QUANTRELL GRACE,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(September 27, 2017)

Before ED CARNES, Chief Judge, JULIE CARNES, and JILL PRYOR, Circuit
Judges.

PER CURIAM:

A jury convicted Quantrell Grace of Hobbs Act robbery and brandishing a

firearm in furtherance of a crime of violence.  As a result of those convictions, the district court, among other things, sentenced him to a lengthy prison term and ordered him to pay restitution.  In these consolidated appeals, he challenges both his convictions and the district court's calculation of restitution.

I.

Because Grace was convicted of two of the crimes charged in the indictment, we recite the facts of his crimes in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict.  See United States v. Martin, 803 F.3d 581, 585 (11th Cir. 2015).  We take the procedural history of this case from the district court record.

A.

On June 21, 2015, Geremias Garcia was working in Opa-locka, Florida, as a delivery driver for Papa Johns.  Sometime before 10:00 pm, someone placed an order with Papa Johns, asking that a pizza be delivered to the Palm Lake Apartments — a home for the elderly.  Garcia was tasked with delivering the order.

Upon nearing the apartment building, Garcia (who was new to the area) called the phone number on the pizza receipt — which ended in 5318 — to ask for directions.  A man answered the phone and began to direct Garcia to the correct address.  As they spoke, Garcia continued to drive.  Eventually, he saw the man on

2

the phone standing on the fourth floor of a building.  The man waved to indicate that he was the person Garcia was speaking to.  Garcia testified at trial that the lighting conditions at this time were very good.

Garcia asked the man to come down to collect his pizza, but the man said to come up to deliver it.  Garcia parked his car and, leaving his phone in the vehicle, went up a staircase to meet the man.  When he opened the door to enter the fourth floor of the building, he saw the man who had waved to him.  There was nothing covering the man's face and the lighting was very good.  The man had his right hand behind his back.  Another person was with him.

The man Garcia had seen wave approached Garcia and put a pistol to his forehead.  The man's companion said to kill Garcia.  The man grabbed Garcia by the back of the neck and forced him to the ground, saying "stay down, stay down, stay down."  The man took all of Garcia's belongings, saying he would not kill Garcia if Garcia gave him all "the money."  The man made off with the money Garcia was carrying, his license, and his wallet.  Garcia testified that he was carrying approximately $700, which included around $200 in his wallet, $70 to $80 that belonged to Papa Johns, and $420 to $430 dollars that he had earned working at Papa Johns over the past three days.  With the gun still pressed against Garcia's head, the man told him to stay where he was.  Garcia remained face-down on the ground until he heard the man run down the stairs.

Garcia then returned to his car and called the police. Detective Darell Rodriguez responded to the call. Garcia described what had happened and provided Detective Rodriguez with the phone number from the pizza receipt. Detective Rodriguez, in turn, provided that number to the detectives in the police department responsible for tracking phone numbers. He was soon advised that the phone was being tracked to an address on West Golf Drive in Miami. Upon researching the address, the detective obtained several names, including Grace's. And he noted that Grace matched Garcia's description of the assailant.

At trial, a representative from Metro PCS/T-Mobile (a cell phone company) testified that the phone number Garcia called (from the pizza receipt) was registered to Trello Santana. But he explained that, because customers pay for Metro PCS phone usage up front, the company does not verify the information they provide and "[a]n individual can use any name they want to." The representative explained that the physical address connected to the cell phone account was the West Golf Drive address. Only one phone was listed on the account. The phone records indicated that, around 10:40 pm on June 21, a call was placed from Garcia's cell phone to that number.

Law enforcement officers from the Miami-Dade Police Department conducted surveillance at the West Golf Drive address. At some point, detectives monitoring the house and cell phone radioed other detectives nearby to indicate

4

that a subject carrying the cell phone was leaving the residence. Those nearby detectives moved in and found "the subject" was Grace, the defendant, and he had the phone. Grace was arrested. He did not have a firearm on his person at that time and the pistol used in the robbery has not been recovered.

After Grace had been detained, Detective Rodriguez prepared a photographic lineup to show Garcia. He used Grace's driver's license photo as well as five other "filler" photographs selected based on Garcia's description of his assailant. Detective Rodriguez traveled to Garcia's house to show him the lineup. He testified that, before showing the photos to Garcia, he gave the standard instructions related to photographic lineups and asked him to sign a document indicating that he had received the instructions. Those instructions included admonitions that: (1) he was not obligated to pick anyone out; (2) that the person who committed the crime might not be in the lineup; and (3) to disregard any markings he might see on the photographs. Detective Rodriguez then, after shuffling the six photographs so he did not know what order they would appear in, showed them to Garcia one-by-one to see if Garcia recognized any of the persons depicted from the robbery.

Garcia testified that Detective Rodriguez did not say anything to him as he was looking at the photographs. Garcia told Detective Rodriguez that the person depicted in the third photograph was his assailant; the third photo was the picture

of Grace.  Garcia testified that he was one hundred percent sure that the person in the photo was the man who attacked him, and Detective Rodriguez testified that Garcia seemed "very certain" of the identification.  Detective Rodriguez had him sign the third photograph after he had reviewed all of the pictures.  Garcia added that Detective Rodriguez did not say anything to him after he identified the third photograph and that the officer's demeanor did not change as a result of the identification.

## B.

Grace was indicted by a federal grand jury for conspiracy to commit a Hobbs Act robbery, substantive Hobbs Act robbery, and brandishing a firearm in furtherance of a crime of violence.  His case was tried before a jury.

During his testimony, Garcia again identified Grace as the man who attacked him.  He testified that the person who assaulted him was approximately five-feet-seven-inches tall, was African American, had black hair, and weighed around 160 to 170 pounds.  He told the jury that he has very good eyesight and does not wear eyeglasses or contact lens.  Through cross-examination, defense counsel highlighted a number of inconsistencies between Garcia's testimony and what he said on earlier occasions.

Detective Rodriguez testified that, after reviewing records of the phone calls placed from jail, he noticed that some of the numbers Grace had called from jail

6

matched some of the numbers that had been dialed from the cell phone used to lure Garcia to the scene of the robbery.  On cross-examination, Detective Rodriguez admitted that none of the numbers that were common to the two call logs were dialed from the cell phone on the night of the robbery.  He also acknowledged that he had never played any recordings of Grace's jail calls for Garcia to see if he recognized Grace's voice.

A significant portion of the cross-examination of Detective Rodriguez focused on the photographic lineup.  When asked why he did not record the lineup, Detective Rodriguez said he was not required to do so.  He also testified that it was not the department's normal practice to record identifications, although he had recorded some identifications in the past.  He admitted that Grace was wearing a black shirt in the photo used in the lineup and Garcia had said that his assailant had been wearing a black shirt during the robbery.  Detective Rodriguez admitted that he did not tell Garcia:  that it was just as important to clear the innocent as to identify the perpetrators of a crime; not to look to the detective for guidance; to take as much time as he needed; that his exact words about the identification would be noted; or that the police would continue to investigate even if he couldn't make an identification.  Detective Rodriguez also acknowledged that he could see the photos as they came up and that a lineup administrator can sometimes influence the victim if he knows which photograph is the suspect's, but he explained that he

7

stood behind Garcia so his reactions or expressions would not influence the identification.  Detective Rodriguez admitted he could have placed the photographs in envelopes or folders to further reduce the risk that he might influence the identification; he testified that he did not do so because it was not required. Detective Rodriguez admitted that after Garcia had made the indentification he told Garcia that the police had someone in custody.

In addition to cross-examining Garcia and Detective Rodriguez about the circumstances of the photographic identification, Grace's trial counsel tried to undermine the identification in at least three other ways.  Each time, the attempt was foiled by the district court.  First, he sought to question Detective Rodriguez about the Miami-Dade Police Department's new policy for photo identifications, which increased the precautions officers were required to take in order to ensure that an eyewitness' identification from a photographic lineup was reliable. Detective Rodriguez did not follow that policy in all of its particulars, but there was some dispute as to whether the policy had become effective at the time of the photographic lineup in this case.  After the government moved to prevent this line of questioning, the district court excluded testimony about the new policy on the grounds that the policy was not relevant and that introducing evidence about it would confuse the jury.

Next, Grace's counsel attempted to present an expert witness who would

testify about the numerous issues with eyewitness identifications according to social science.  The district court granted the government's motion to preclude the expert from testifying because prior precedent from this Court established that the testimony was not admissible under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786 (1993), that cross-examination was a sufficient tool to address any problems with the eyewitness identification in this case, and that the testimony would not assist the trier of fact.

Finally, defense counsel asked the district court to include in its charge to the jury a lengthy instruction detailing some of the problems with eyewitness testimony that he contended social science has identified.  The district court declined to do so, instead giving a relatively standard instruction to the jury about how it should evaluate eyewitness identifications.

The jury convicted Grace of Hobbs Act robbery and brandishing a firearm in furtherance of a crime of violence, but acquitted him on the conspiracy charge. The court later sentenced Grace to 125 months in prison followed by 48 months of supervised released and ordered him to pay $627.01 of restitution.  Grace appeals his conviction and the calculation of restitution.

II.

Grace primarily contends that the district court erred by restricting in several ways his ability to counter Garcia's eyewitness testimony.  He argues that the

district court improperly (1) restricted his ability to cross-examine Detective Rodriguez, (2) ruled that his expert witness' testimony was inadmissible, and (3) rejected his proposed jury instructions related to eyewitness identifications.[1]

We review each of those rulings only for an abuse of discretion. See United States v. Takhalov, 827 F.3d 1307, 1311 (11th Cir. 2016) (refusing to give a jury instruction); United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (excluding expert testimony); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370–71 (11th Cir. 1994) (limiting cross-examination). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." Hartford Cas. Ins. Co. v. Crum & Forster Specialty Ins. Co., 828 F.3d 1331, 1333 (11th Cir. 2016) (quotation marks omitted). But we determine de novo the legal correctness of a proposed jury instruction, Takhalov, 827 F.3d at 1312, and recognize that "[w]hile the district court has discretionary authority to rule on the admissibility of evidence, including the power to limit cross-examination, [that] discretion is limited by the guarantee of the Sixth Amendment's Confrontation Clause that a criminal defendant has the right to cross-examine prosecutorial witnesses," United

_____

[1] Grace also contends that, even if none of these three errors is (on its own) sufficient to warrant reversing his conviction, the three of them together deprived him of his right to a fair trial. Because we ultimately reject two out of three of Grace's claims of error on their merits and conclude that (to the extent his last claim of error has merit) the remaining error was harmless, however, we are not persuaded by his cumulative effect contention.

10

States v. Maxwell, 579 F.3d 1282, 1295 (11th Cir. 2009) (quotation marks omitted).

A.

We begin with Grace's argument that the district court improperly restricted his cross-examination of Detective Rodriguez by refusing to allow his attorney to question the detective about the Miami-Dade Police Department's photographic lineup procedures.

Grace claims that the district court's limitations on his cross-examination of Detective Rodriguez violated his Sixth Amendment right to confront the witnesses against him. "The Confrontation Clause of the Sixth Amendment guarantees criminal defendants an opportunity to impeach through cross-examination the testimony of adverse witnesses." United States v. Arias-Izquierdo, 449 F.3d 1168, 1178 (11th Cir. 2006). That said, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985). "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986). A

11

limitation on cross-examination violates the Sixth Amendment only where "a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." United States v. Maxwell, 579 F.3d 1282, 1296 (11th Cir. 2009) (quotation marks omitted).

And even if a reasonable jury would have received a different impression of a witness' credibility as a result of the defense's legally permissible but erroneously prohibited line of cross-examination, that constitutional violation will not require reversal of the conviction if the error was harmless beyond a reasonable doubt. Van Arsdall, 475 U.S. at 680–81, 106 S. Ct. at 1436. An error is harmless if it did not contribute to the verdict obtained. Weaver v. Massachusetts, 582 U.S. ___, 137 S. Ct. 1899, 1907 (2017). Whether a constitutionally erroneous limitation on cross-examination is harmless "depends upon a host of factors," which "include [1] the importance of the witness' testimony . . . , [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and . . . [5] the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438.

In this case, we need not determine whether the district court's decision to preclude Grace from cross-examining Detective Rodriguez about his department's

12

lineup procedures violated the Sixth Amendment. Even if it did, that error was harmless beyond a reasonable doubt.[2]

To begin with, the probative value of this line of cross-examination is weak. Evidence that Detective Rodriguez did not follow the new departmental procedure governing photographic lineups would not necessarily show that Garcia's identification of Grace was unreliable. At best, it would show that the identification procedure could have been conducted in a <u>more</u> reliable way. <u>Cf.</u> <u>Dusenbery v. United States</u>, 534 U.S. 161, 172, 122 S. Ct. 694, 702 (2002) ("Even if one accepts that the [Bureau of Prison's] current procedures improve delivery to some degree, our cases have never held that improvements in the reliability of new procedures necessarily demonstrate the infirmity of those that were replaced. Other areas of the law, moreover, have for strong policy reasons resisted rules crediting the notion that, because the world gets wiser as it gets older, therefore it was foolish before.") (quotation marks omitted). And defense counsel was able to make a similar point through cross-examination by asking Detective Rodriguez if he could have conducted the procedure in a different way.

Even without the evidence demonstrating that Garcia identified Grace at an

_____

[2] The government does not argue in its brief that, to the extent the district court's limitation on Grace's ability to cross-examine the detective violated the Sixth Amendment, the error was harmless, but we "may consider the harmlessness of a trial court's error where it has not been briefed by the Government." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993); <u>see also</u> <u>United States v. Troya</u>, 733 F.3d 1125, 1136 (11th Cir. 2013).

earlier photographic lineup, the evidence against Grace was strong and Garcia's

identification was corroborated by other evidence at trial.  The cell phone used in

the robbery was registered to Grace's address, he was found with it after leaving

that address, and Garcia identified him in open court.  To the extent the district

court erred by not permitting this line of cross-examination, the error was harmless

under Chapman. [3]

### B.

Next, Grace argues that the district court abused its discretion by excluding

the testimony of his expert on eyewitness identification.  But we have explained

that "a district court does not abuse its discretion when it excludes expert testimony

on eyewitness identification" because that testimony is often not helpful to the

jury.  United States v. Smith, 122 F.3d 1355, 1357–59 (11th Cir. 1997); see also

United States v. Thevis, 665 F.2d 616, 641 (5th Cir. Unit B 1982).[4]  Regardless of

whether the concerns about eyewitness testimony discussed in the array of

secondary sources Grace cites in his briefs cast doubt on our reasoning in Smith or

the former Fifth Circuit's reasoning in Thevis, we are bound to follow those

decisions unless and until they are overruled by the Supreme Court or this Court

[3] For similar reasons, we conclude that — to the extent the district court erred by excluding this line of cross-examination under the Federal Rules of Evidence — the error was harmless.  See Fed. R. Crim. P. 52(a); United States v. Lehder-Rivas, 955 F.2d 1510, 1518 (11th Cir. 1992) (concluding that an erroneous ruling under Rule 403 is subject to harmless error review).

[4] We have adopted as binding precedent in this Circuit all of the decisions of Unit B of the former Fifth Circuit.  United States v. Schultz, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009).

sitting en banc.  Smith, 122 F.3d at 1359.

C.

Grace also argues that the district court abused its discretion by rejecting his proposed jury instruction dealing with eyewitness identifications.  His eight-page instruction differed from the instruction given by the district court primarily because it discussed more issues with eyewitness identification than the district court's instruction addressed and discussed the issues the district court's instruction did address at greater length.  In determining whether a district court's refusal to give a requested instruction was an abuse of discretion, "we will reverse only if (1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense."  United States v. King, 751 F.3d 1268, 1275 (11th Cir. 2014) (quotation marks omitted).

In our decision in King, we held that a jury instruction "substantially cover[s]" a proposed instruction if "the charge, when viewed as a whole, fairly and correctly states the issues and the law."  Id. (quotation marks omitted).  We also held that the jury charge regarding eyewitness identifications in that case satisfied that requirement, even though (despite a request from the defendant) it did not include any language discussing cross-racial identifications.  Id.  There are only

15

two differences between the instruction we upheld in King and the instruction here. First, the instruction in King explicitly informed the jurors that, when evaluating an eyewitness' testimony, they could consider questions other than those suggested by the court. Id. at 1276. Second, the instruction in this case suggested that the jurors (in addition to considering the questions posed by the instruction in King) consider whether "anything affect[ed] the witness's ability to focus on the [assailant]."

We are not persuaded that these differences make a difference. Though the King court told the jury to consider specific questions "among others," while the district court here told the jurors to "ask [themselves] questions" and then listed examples, the meaning in both cases is the same. The district court did not limit the ambit of questions the jurors could consider and the list that followed its admonition to "ask . . . questions" was plainly a list of examples. The fact that the district court added an additional example of potential questions jurors might ask themselves when evaluating eyewitness testimony helped rather than harmed Grace.

To the extent that the evidence in this case may have raised issues with eyewitness identifications that were not discussed in the King decision, that does not matter. King rejects the idea that the district court must, in its instruction on evaluating eyewitness identifications, explicitly address every potential problem with eyewitness identifications that is raised by the defense. See id. It is enough

that the district court provides a non-exhaustive list of questions that are generally relevant to evaluating eyewitness identifications, leaving to counsel in closing arguments to suggest other questions that may also be relevant to evaluating the particular eyewitness identification in a given case. See id. For that reason, we conclude that the district court's instruction substantially covered the instruction suggested by the defense in this case. As a result, the district court did not abuse its discretion by declining to give the requested instruction.

### III.

Grace next contends that the district court should have dismissed his indictment for brandishing a firearm in furtherance of a crime of violence. This is so, he argues, because Hobbs Act robbery does not amount to a crime of violence under 18 U.S.C. § 924(c) in the wake of the Supreme Court's decision in Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551 (2015). We have not yet determined whether Johnson's holding that the residual clause of 18 U.S.C. § 924(e) was unconstitutionally vague applies to the residual clause of § 924(c). In re Fleur, 824 F.3d 1337, 1340 (11th Cir. 2016). But a prior panel of this Court has held that Hobbs Act robbery qualifies as a crime of violence under the elements clause of § 924(c), which would not have been affected by Johnson. Id. at 1341. If Grace believes that holding is erroneous, he must take it up with either the Supreme Court or this Court en banc. See United States v. Archer, 531 F.3d 1347,

17

1352 (11th Cir. 2008) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc.").[5]

## IV.

Finally, Grace contends that the district court erred in calculating the amount of restitution he owes as a result of his convictions. We review a district court's calculation of restitution only for an abuse of discretion. United States v. Robertson, 493 F.3d 1322, 1330 (11th Cir. 2007). Because Grace does not contend that the district court applied the wrong law, misinterpreted the law, misapplied the law, or employed improper procedures in calculating its restitution award in this case, its calculation could be an abuse of discretion only if the factual findings supporting it were clearly erroneous. See Hartford Cas. Ins. Co., 828 F.3d at 1333. They were not.

There was testimony and other evidence that contradicted Garcia's claim that Grace stole $700 from him.[6] But the district court's decision to credit Garcia's

---

[5] Grace argues that In re Fleur was merely a three-judge order denying a second or successive petition for relief under 28 U.S.C. §§ 2255(h) and 2244(b) and, for that reason, should not be considered binding precedent. But that argument is, itself, precluded by prior panel precedent. See In re Lambrix, 766 F.3d 789, 794 (11th Cir. 2015) ("[P]ublished three-judge orders issued under § 2244(b) are binding precedent in our circuit."); cf. Griffin v. Sec'y, Fla. Dep't. of Corr., 787 F.3d 1086, 1095 n.7 (11th Cir. 2015) (explaining that "[t]he denial of a COA by three judges in a published opinion . . . does constitute binding precedent that the issue in question has no merit"). We are bound by this Court's decision in In re Lambrix.

[6] While the district court did not explain its restitution calculation in detail, it appears (from the Government's Motion in Support of Restitution) that it settled on the amount of

version of events instead of the evidence that contradicted it is a credibility judgment. Because the district court heard the testimony and, as a result, is in the best position to judge its veracity, we will reverse its decision to credit a witness' testimony over contradictory evidence only where the credited testimony "is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (quotation marks omitted). Garcia's testimony was not so improbable that no factfinder could believe it over the contrary evidence, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1512 (1985).

## V.

To the extent that the district court erred by limiting Grace's cross-examination of Detective Rodriguez, that error was harmless beyond a reasonable doubt. The district court did not abuse its discretion by excluding the testimony of Grace's eyewitness identification expert or declining to instruct the jury as Grace requested. It did not err by concluding that Hobbs Act robbery qualifies as a crime of violence under 18 U.S.C. § 924(c). And its restitution calculation was not

---

$627.01 because approximately $72.99 of the $700.00 Garcia testified was taken from him belonged to Papa Johns.

19

clearly erroneous or an abuse of discretion.

**AFFIRMED.**